# IN THE UNITED STATES COURT OF APPEALS

# FOR THE FIFTH CIRCUIT

_____

m 98-41129

_____

UNITED STATES OF AMERICA,

Plaintiff-Appellee,

VERSUS

CECIL ANTHONY DORTCH,

Defendant-Appellant.

_____

Appeal from the United States District Court
for the Eastern District of Texas

_____

December 23, 1999

Before GARWOOD, SMITH, and
BENAVIDES, Circuit Judges.

JERRY E. SMITH, Circuit Judge:

Cecil Dortch appeals his conviction of possession with intent to distribute cocaine in violation of 28 U.S.C. § 841(a)(1). He challenges the denial of his motion to suppress evidence, the sufficiency of the evidence, and the denial of his motion to proceed *pro se*. Concluding that the inculpatory evidence was the fruit of an illegal search, we reverse and remand for entry of a judgment of acquittal.

I.

At approximately 11:30 p.m., highway patrol officers Rick Anderson and Robert Ener stopped Dortch on Interstate 10 near Beaumont, Texas, purportedly for traveling too close to a tractor-trailer. Dortch was driving and was accompanied by a female acquaintance. According to the record (including a videotape mounted in the patrol car), Dortch, on the officers' request, exited the car, produced his license and car rental papers, and consented to a pat down search to ensure that he was not carrying a weapon; none was found.

After examining the rental papers, the officers determined that the car was rented to a third person[1] and that Dortch was not listed as an authorized driver. Anderson then questioned Dortch and the passenger about who owned the car and what they were doing in the area. Dortch and the passenger gave inconsistent answers about Dortch's relationship to the person who had rented the car, and although Dortch stated that they had been in Houston for the last two days, the rental car papers showed that the car had been rented the day before in Pensacola, Florida, where Dortch lived, and he stated that they were not carrying any luggage.

While Anderson questioned Dortch, Ener took Dortch's drivers license and car rental papers and called a dispatcher to run a computer check for warrants and to determine whether the car was stolen. About eight minutes into the stop, while the computer check was pending, Anderson requested consent to search the vehicle. Dortch stated that the officers could search the trunk but not the vehicle, so no search of the vehicle was performed at that time.

The officers told Dortch that he would be free to leave after the check for warrants was complete but that the officers would detain the car until they had performed a canine search of it. At that time, the officers first called for the canine unit to be sent to the scene. Again, Anderson patted down Dortch in a search for weapons, and again nothing was found.

---

[1] The car was rented to a Nicki Bender; it is not evident whether she was Dortch's wife, cousin, or another girlfriend. Her identity does not seem particularly important, and neither party dwells on it.

After about 14-15 minutes had elapsed, Anderson received Dortch's criminal record from the dispatcher and questioned Dortch about the details of that record. Anderson did not, however, inform Dortch that the computer check had been completed (although it had) or that he would be free to go at any time, and it is not plain, from the record, what, if anything, remained to be done with respect to that check.

Approximately 19-20 minutes after the initial stop, the officers spotted the canine unit across the four-lane interstate and median. They then informed Dortch that the computer check for outstanding warrants had been completed and had turned up nothing, but that the canine unit was going to perform a search nonetheless. Dortch remained at the scene until the dogs arrived and performed their search, and his driver's license and rental papers remained with the officers on a clipboard.

According to Ener, the dog alerted to the driver's side door and seat, but the subsequent search of the car still uncovered no contraband. Approximately another ten minutes elapsed during the canine search. The officer handling the canine then informed Anderson that there could be contraband on the body of the person who had been sitting in the driver's seat. Ener stated that Dortch consented to a third pat down search at that time, though this consent is not recorded on the video or audio portions of the tape.

This time, Ener conducted a more thorough search of Dortch's person and testified that he noticed a large hard bulge in the crotch area that did not appear to be "part of his [Dortch's] body." Again, the pat down and discovery of the bulge are not on the video.

2

The bulge apparently was a plastic baggie holding five smaller baggies that contained 137.35 grams of cocaine.

The officers arrested Dortch and the passenger, but she was not charged. Dortch was indicted for possession with intent to distribute cocaine in violation of 21 U.S.C. § 841(a)(1) and for conspiracy to commit the underlying offense in violation of 21 U.S.C. § 846.

Sixteen months later, a search warrant issued for Dortch's residence in Pensacola,[2] where officers recovered a sifter, triple beam scales, Inositol powder, baking powder, and a firearm. Several of these items had crack cocaine residue.

Dortch moved to suppress the evidence obtained during the traffic stop, arguing that the cocaine found on his person was discovered in violation of the Fourth Amendment. The bases for this assertion were that the search and seizure exceeded their permissible scope under *Terry v. Ohio*, 392 U.S. 1 (1968), that there was no probable cause or reasonable suspicion to pat down Dortch a third time or to conduct a more intensive pat down, and that Dortch had not consented to the final search of his person that uncovered the contraband.

Following a hearing, the court, in a short non-detailed order, denied the motion to suppress, stating, "The court finds that the police officer had probable cause to search Dortch's body. The Court further finds that

Dortch consented to the search of his body." Accordingly, the court concluded there was no Fourth Amendment violation. The jury returned guilty verdicts on both counts, but the court granted Dortch's motion for acquittal on the conspiracy count.

Dortch argues that the prolonged detention that followed the traffic stop and the warrant-less search of his person were unreasonable in violation of the Fourth Amendment. He contends that once the officers issued the oral warning for the traffic violation and received information from the computer check that he had no outstanding warrants, the justification for the stop ended, and the officers should have allowed him to leave at that time. He further argues that his continued detention required a separate justification (which he urges was lacking) and that the third pat-down search was nonconsensual and therefore required probable cause.

## II.

In considering a ruling on a motion to suppress, we review questions of law *de novo* and factual findings for clear error. *United States v. Castro*, 166 F.3d 728, 731 (5th Cir.) (en banc), *cert. denied*, 120 S. Ct. 78, *cert. denied*, 120 S. Ct. 309 (1999). We view the evidence in the light most favorable to the party that prevailed in the district courtSSin this case, the government. *Id.*

Although Dortch initially argues in his brief that the stop was unreasonable, he does not expand upon that argument. Moreover, he later argues that the illegality occurred when the justification for the initial stop ended and the officers lacked authority for the continued detention and additional search. Thus, he seems to concede the legality of the initial traffic stop, and there can be no serious

---

[2] Dortch argued that the residence searched was not his, and he introduced evidence that it was rented to another person. Dortch does not raise this issue on appeal, however, so we do not address it.

3

question as to that conclusion.[3]

Dortch also does not challenge the legality of the canine search of the vehicle. It is worth noting, however, that such a challenge likewise would be unavailing, because a dog sniff does not constitute a search or seizure under the Fourth Amendment. *See United States v. Seals*, 987 F.2d 1102, 1106 (5th Cir. 1993). And once the dogs "alerted" to the driver's side of the car, probable cause to search the vehicle was established. *See United States v. Zucco*, 71 F.3d 188, 191-92 (5th Cir. 1995) (holding that once a dog had alerted to the interior wall of the van, there was probable cause to dismantle the wall).[4] Nor does Dortch challenge either of the first two pat-

[3] *See, e.g., United States v. Causey*, 834 F.2d 1179, 1184 (5th Cir. 1987) (en banc) (noting that "so long as police do no more than they are objectively authorized and legally permitted to do, their motives in doing so are irrelevant and hence not subject to inquiry").

[4] Given that Dortch does not challenge the legality of the search, it is puzzling that the dissent goes to such efforts to develop its theory that "because the rental agreement provided only the renter was an authorized driver, Dortch had no right to complain of the vehicle's detention." In arguing that Dortch has no legitimate privacy interest in a rental car, the dissent seems to miss the point.

As we explain above, Dortch's complaint is not that the *vehicle* was detained or improperly searched, but rather that *he* was improperly seized in that, under the circumstances, he would not feel free to leave without his vehicle or his driver's license, and because he could not reasonably be expected to wander off down the highway in an unfamiliar area. Therefore, it is irrelevant whether Dortch had a legitimate expectation of privacy in the car, for it cannot be disputed that he had a legitimate interest in not being unreasonably seized.

down searches, which did not uncover any evidence.

The thrust of Dortch's appeal is that although the officers were justified in stopping the car, in performing a search for weapons on his person, and in detaining him for some period of time incident to the stop, at some point the detention became unreasonable and exceeded the scope of intrusion allowed under *Terry*. Dortch concludes that because the continued detention was unreasonable and violated the Fourth Amendment, the subsequently discovered cocaine is inadmissible as "fruit of the poisonous tree."[5] Alternatively, he concludes that the third search of his body was itself unreasonable because of a lack of probable cause or consent.

A.

As for the claim that the detention exceeded the scope of a permissible *Terry* stop, we evaluate the legality of investigatory stops under a dual inquiry: "whether the officer's action was justified at its inception, and whether it was reasonably related in scope to the circumstances which justified the interference in the first place." *United States v. Shabazz*, 993 F.2d 431, 435 (5th Cir. 1993) (citing *Terry*, 392 U.S. at 19-20). In *Shabazz*, the court noted that the detention following a stop must be tailored to its underlying justification and that, once an officer conducts a pat down search of one suspected only of carrying a gun,

[5] *See Segura v. United States*, 468 U.S. 796, 804 (1984) (observing that the exclusionary rule reaches not only primary evidence obtained as a direct result of an illegal search or seizure, but also evidence later discovered and found to be derivative of illegality, or "fruit of the poisonous tree").

4

the officer, upon finding no weapon, may not further detain the person to question him. *See Shabazz*, 993 F.2d at 436.

Like the defendants in *Shabazz*, Dortch cannot successfully claim that the detention until the computer check was complete exceeded its original scope. Because this was a valid traffic stop, the officers were permitted to request Dortch's license and the registration or rental papers for the car and to run a computer check thereon. *See id.* at 437; *see also United States v. Kelley*, 981 F.2d 1464, 1469 (5th Cir. 1993). Although Dortch was detained and questioned while the computer check was pending, this was lawful.

The Constitution was violated, however, when the detention extended beyond the valid reason for the initial stop. To be sure, Dortch did not feel free to leave even after the officer had informed him that the computer check was completed, because the officers still held his license and rental papers and had told him they were going to detain his car until the dog team arrived.

Although, upon arrival of the dogs, the officer asked Dortch whether he wanted to stick around while the dogs completed their search, Dortch's acquiescence at this point cannot be considered voluntary. It is unlikely, in these circumstances, that he would feel free to walk off down the highway, particularly given the fact that the officers still held his license and that Dortch was in an unfamiliar, relatively deserted area, miles from the nearest town, in the middle of the night. As noted in *United States v. Lambert*, 46 F.3d 1064, 1068 (10th Cir. 1995), "what began as a consensual encounter quickly became an investigative detention once the agents received [defendant's] driver's license and did not return it to him."

The government argues that because the drug-sniffing dogs arrived within moments of the completion of the computer check, and because the computer check served a valid law enforcement purpose, Dortch was not unreasonably detained. This contention gains superficial support from *United States v. Sharpe*, 470 U.S. 675 (1985), holding that a defendant who was suspected of transporting drugs in his truck and was held for twenty minutes pending the arrival of a DEA agent had not been unreasonably detained:

> While it is clear that "the brevity of the invasion of the individual's Fourth Amendment interests is an important factor in determining whether the seizure is so minimally intrusive as to be justifiable on reasonable suspicion," we have emphasized the need to consider the law enforcement purposes to be served by the stop as well as the time reasonably needed to effectuate those purposes.

*Id.* at 685 (citations omitted).

But *Sharpe*, on further examination, is inapposite, for the court of appeals had assumed that the officers "had an articulable and reasonable suspicion that [the suspects] were engaged in marijuana trafficking when [the officers] stopped the Pontiac and the truck," *id.* at 680, and the Supreme Court accepted that assumption. Thus, the delay required for the DEA agent to arrive on the scene was necessary to effect the purposes of the initial stopSSdrug investigation.

Here, however, there was no reasonable or articulable suspicion that Dortch was trafficking in drugs. The answers he and the passenger gave, even assuming they were

suspicious, did not give rise to that inference. Rather, the confusion as to the relationship of Dortch to the proper renter of the vehicle, combined with Dortch's absence as an authorized driver on the rental agreement and the allegedly inconsistent answer about the stay in Houston, gave rise only to a reasonable suspicion that the car might have been stolen.

The government also argues that the police had reasonable suspicion that Dortch was trafficking drugs because he appeared nervous. Ener testified that while Anderson was questioning Dortch, Dortch became increasingly more nervous and gazed around "as if he was looking for a place to run." But if Dortch were awaiting an opportunity to flee, that chance arose when the officers informed him that the warrant check was negative and he was free to go.

The government has not advanced any theory explaining how the officers retained a reasonable suspicion even after the warrant check came back negative and Dortch had passed on his opportunity for flight. Assuming, *arguendo*, that Dortch voluntarily consented to remain at the scene for the canine search, the police cannot continue to rely on this assertion to support their conclusional statement that he was nervous.

Essentially, the government asks us to find that officers have reasonable suspicion to suspect drug trafficking anytime someone is driving a rental car that was not rented in his name. We reason, to the contrary, that the law enforcement purposes to be served by the computer check were only to ensure that there were no outstanding warrants and that the vehicle had not been stolen.

Those purposes were served when the computer check came back negative, and Dortch should have been free to leave in his car at that point. Once he was not permitted to drive away, the extended detention became an unreasonable seizure, because it was not supported by probable cause.[6] To hold otherwise would endorse police seizures that are not limited to the scope of the officers' reasonable suspicion and that extend beyond a reasonable duration.

*Sharpe* can be distinguished also because the Court there emphasized that a twenty-minute stop was not *per se* unreasonable where the delay for the agent to arrive "was attributable almost entirely to the evasive actions of [one of the suspects] . . . . Except for [the suspect's evasive] maneuvers, only a short and certainly permissible pre-arrest detention would likely have taken place." *Sharpe*, 470 U.S. at 687-88.

The delay for the canine unit to arrive cannot be attributed to any of Dortch's actions. In fact, it was approximately 9-10 minutes into the stop before the officers first requested that the dispatcher send the canine unit. The officers offered no justification for this delay; to the contrary, Ener testified that these officers' main duty was drug interdiction, including checking suspected vehicles for narcotics. It is therefore reasonable to expect that they would have anticipated needing a canine unit within a few minutes of stopping a suspect.

Nor does the result in *Shabazz* change this

---

[6] *See Michigan v. Summers*, 452 U.S. 692, 700 (1981) ("[E]very seizure having the essential attributes of a formal arrest[] is unreasonable unless it is supported by probable cause.").

6

conclusion. There, we cited *Sharpe* with approval, applying its holding to a search for drugs made during a stop for other law enforcement purposes. The officers' original justification for the stop was excessive speed, but we held that "[b]ecause the officers were still waiting for the computer check at the time that they received consent to search the car, the detention to that point continued to be supported by the facts that justified its initiation." *Shabazz*, 993 F.2d at 437.

That is not the case here, because the justification for detention ceased once the computer check came back negative, and the canine search was not performed until after that completed check. Admittedly, that search, if performed *during* the detention, would not have violated Dortch's constitutional rights, because it is not a search at all under the Fourth Amendment. *See Seals*.

Thus, to say that the search was unconstitutional because it was during an unlawful detention makes that determination turn on the fact that the search occurred moments after the computer check was completed, rather than moments before. But it is well established that "an investigative detention must be temporary and last no longer than is necessary to effectuate the purpose of the stop." *Florida v. Royer*, 460 U.S. 491, 500 (1983). And while we "should not indulge in unrealistic second-guessing" of the methods employed by the officers on the scene, *see Sharpe*, 470 U.S. at 686, the evidence makes such second-guessing unnecessary and plainly reflects that the computer search had already ended before the dog search began; at that point it was unreasonable to detain Dortch any longer.

This conclusion is bolstered by the fact that the canine search took another ten minutes, with the dogs first circling the car for a few moments before a dog alerted to the driver-side door. Although at this point the officers then established probable cause to search the interior of the car and to detain Dortch until a more thorough search could be completed, by then it was too late: Any probable cause established as a result of the canine search was subsequent to the unlawful seizure.

As a result, the district court erred in concluding that the third search of Dortch's body was justified by probable cause. The "fruit of the poisonous tree" doctrine, as articulated in *Segura v. United States*, 468 U.S. 796, 804 (1984), counsels that the probable cause to search his body would never have been established if not for the previous unlawful detention, and the cocaine never would have been discovered.

Under the fruit of the poisonous tree doctrine, all evidence derived from the exploitation of an illegal search or seizure must be suppressed, unless the government shows that there was a break in the chain of events sufficient to refute the inference that the evidence was a product of the constitutional violation. *See United States v. Cherry*, 759 F.2d 1196, 1210-11 (5th Cir. 1985). Thus, the district court should have granted the motion to suppress, unless Dortch nonetheless consented to the third body search. Without this consent, there is no other break in the chain of events that would refute the inference that the cocaine's discovery was the product of the Fourth Amendment violation.

## B.

Although Dortch's detention exceeded the permissible scope of a *Terry* stop, "[c]onsent to search may, but does not necessarily,

7

dissipate the taint of a [prior] fourth amendment violation." *United States v. Chavez-Villarreal*, 3 F.3d 124, 127 (5th Cir. 1993). Where there has been a prior constitutional violation, the government's burden to prove that the defendant consented becomes all the more difficult.

> To be valid, consent to search must be "free and voluntary." The government has the burden of proving, by a preponderance of the evidence, that the consent was voluntary. Where consent is preceded by a Fourth Amendment violation, the government has a heavier burden of proving consent. The voluntariness of consent is "a question of fact to be determined from the totality of the circumstances." We will not reverse the district court's finding that consent was voluntary unless it is clearly erroneous. Where the judge bases a finding of consent on the oral testimony at a suppression hearing, the clearly erroneous standard is particularly strong since the judge had the opportunity to observe the demeanor of the witnesses.

*Shabazz*, 993 F.2d at 438 (internal citations omitted).

The finding of consent was based on a suppression hearing at which Dortch both testified and had the opportunity to question the government's witness. As we have noted above, we typically should accord the district court's determination much deference. *See United States v. Sutton,* 850 F.2d 1083, 1086 (5th Cir. 1988). The order denying the motion to suppress is non-detailed, however, and there is no indication that the court considered that there had been a Fourth Amendment violation that would color any subsequent consent.

Indeed, the finding of probable cause indicates that the court did not believe there had been a prior unlawful seizure, so it is highly unlikely that the court would have applied the "heavier burden" required by *Shabazz*.

In *Chavez-Villarreal*, 3 F.3d at 127, we noted that when we evaluate consent given after a Fourth Amendment violation, "[t]he admissibility of the challenged evidence turns on a two-pronged inquiry: whether the consent was voluntarily given and whether it was an independent act of free will." Voluntariness focuses on coercion, and the second prong considers the causal connection between the "consent" and the prior constitutional violation. *See id.*

In evaluating the voluntariness of a consent, we have looked to six factors:

> (1) the voluntariness of the defendant's custodial status; (2) the presence of coercive police procedures; (3) the extent and level of the defendant's cooperation with the police; (4) the defendant's awareness of his right to refuse consent; (5) the defendant's education and intelligence; and (6) the defendant's belief that no incriminating evidence will be found. Although all six factors are relevant no single factor is dispositive.

*Shabazz*, 993 F.2d at 438. Because of the deferential standard of review, we assume the district court implicitly considered these factors. It is, therefore, hard to say that the finding of voluntariness was "clearly erroneous."

Yet, assuming *arguendo* that the court correctly found that Dortch consented to the third pat down search voluntarily, "consent

does not remove the taint of an illegal detention if it is the product of that detention and not an independent act of free will." *Chavez-Villarreal*, 3 F.3d at 128. In *Chavez-Villarreal*, we held it unnecessary to inquire into the voluntariness prong, as we found that under the circumstances of the detention, the defendant's consent was not an independent act of free will. It was significant that the officers still retained his alien registration cards, and we held that even though the officer told him he could refuse to consent to the second search, such a refusal seemed pointless by then. *Id.*

Here, refusal similarly would have seemed useless to Dortch: He had previously refused permission to search the car, yet he was required to stand by and watch the dogs perform their search nonetheless and then to watch the officers comb every part of the interior of the vehicle. Moreover, the officers still held his license and rental papers, and there is no indication that they, as did the officers in *Chavez-Villarreal,* informed the defendant that he could refuse consent. In the context of this prolonged unlawful detention, and in light of the fact that his previous refusals were seemingly ineffective, Dortch's consent cannot be considered an independent act of free will.

The government contends that *United States v. Kelley*, 981 F.2d 1464 (5th Cir. 1993), counsels that Dortch's consent was nonetheless valid because he might have thought the officers would not discover the cocaine on his person. The government points to the facts that Dortch had already been patted down twice and that the drugs were not found, to support its contention that Dortch believed that he had secreted them in a place where they would not be revealed.

A defendant's belief that no evidence will be found is a relevant factor in the voluntariness inquiry but not in considering whether the causal connection between the consent and the illegal detention was broken. Under the second prong of the consent inquiry, we consider three factors to determine whether the causal chain was broken: (1) the temporal proximity of the illegal conduct and the consent; (2) the presence of intervening circumstances; and (3) the purpose and flagrancy of the initial misconduct. *Chavez-Villarreal*, 3 F.3d at 128.

First, the videotape establishes a close temporal proximity between the illegal conduct and the consent, because the illegal conductSSthe detentionSScontinued until the officers had sought Dortch's consent to search his person a third time. Second, no circumstances intervened between the detention and the consent, and there is no reason to think that Dortch believed he was free to go during that time. Finally, while the purpose of the officers' conduct cannot be known, it is apparent from the videotape that they intended all along to detain the car until the canine unit arrived; indeed, they told Dortch as much. Thus, this final factor also seems to weigh in favor of finding there was no consent.

The government also points to the fact that Dortch is a relatively intelligent man, one who has successfully represented himself *pro se* in a previous criminal appeal, as evidence of the fact that his consent was voluntary. But like the fact that Dortch may have consented to the third search because he did not expect the officers to find anything, Dortch's intelligence level and his knowledge of his legal right to refuse consent are not relevant to the "causal connection" prong of the inquiry.

In sum, even if Dortch's consent was voluntarily given, and the district court's determination therefore was not clearly erroneous, the consent was not valid. Instead, because the causal chain between the illegal detention and Dortch's consent to a third body search was not broken, the search was non-consensual. And because there was no probable cause to search his person, the evidence obtained during that search should have been suppressed. Likewise, the evidence that was found in his residence as the result of a search warrant issued after the cocaine was found on his person must be excluded as fruit of the poisonous tree.

There being no other inculpatory evidence sufficient to convict Dortch of possession with intent to distribute cocaine, the conviction is REVERSED, and the judgment is REMANDED for entry of a judgment of acquittal.

GARWOOD, Circuit Judge, dissenting:

I dissent. The district court did not err in denying the motion to suppress.

I.

To begin with, the officers had reasonable suspicion of contraband trafficking sufficient to warrant the very brief – five minutes or less – additional detention of the vehicle following the report on Dortch's driver's license check and until the alert of the previously summonsed K-9. The following matters reflected by the prosecution's evidence at the suppression hearing–at which Dortch presented no evidence–more than suffice to establish reasonable suspicion of contraband trafficking:

1. Though the car had been rented in Pensacola, Florida–which the court could judicially notice was some 500 miles east of Houston–on March 4, at 4:30 p.m., and the stop was near Beaumont

(about 88 miles east of Houston) on March 5 at 11:30 p.m. (31 hours later), Dortch and the passenger told the officers "they had been in Houston for two days". Given normal driving times, it would be reasonable to conclude this was likely a fabrication.

2. Despite having asserted they had been in Houston for two days, Dortch told the officers they had no luggage.

3. Dortch acted "very nervous" and "couldn't stand still."

4. Officer Ener testified: "The car was rented by Nicki Bender. Nicki Bender was not present in the car, and the rental papers showed there were no additional drivers allowed for the vehicle," and no one was "present who had the authority to operate that vehicle." Officer Ener testified that one of his "reasons for detaining the vehicle" was that "neither the driver nor the passenger, were authorized drivers of that vehicle."

5. Dortch told one officer that Bender was his cousin; the passenger told one officer that Bender was Dortch's wife and told another officer that she was his girlfriend.

6. There was no evidence at the suppression hearing that Bender authorized either Dortch or the passenger to drive the car (or even that Dortch so claimed to the officers).

The majority rejects what it characterizes as the government's argument "that officers have reasonable suspicion to suspect drug trafficking anytime someone is driving a rental car that was not rented in his name." The majority's approach in this respect is flawed for several reasons. It ignores other suspicious factors–e.g., items 1,2,3 and 5 above. It also ignores the facts that not only was the driver not the renter, but the renter was not present in the vehicle, "the rental papers" provided that "no additional drivers" [other than the renter] were "allowed for the vehicle" so that neither the driver nor the sole passenger was authorized to drive the vehicle, and there was nothing to document any

11

relationship between anyone present in the vehicle and either its renter or its owner. Finally, the majority in this connection also simply overlooks the testimony of Officer Ener, a nine and a half year veteran police officer, that the third party rental aroused his suspicions because "frequently persons who are transporting narcotics or other illegal substances will have someone else rent a car for them, and they will take possession of the car at a later time" and "in my training and experience, it's been common for a third person, someone who is not in the car, to rent a car to be used for transporting narcotics or other contraband."

The majority cites no authority for its conclusion that circumstances such as none of a rented vehicle's occupants being either an authorized driver of it or having any documented relation to the vehicle or the party renting it, do not give rise to reasonable suspicion of contraband trafficking. Nor am I aware of any such authority. To the contrary, in *United States v. Jones*, 44 F.3d 860 (10th Cir. 1995), the Court found reasonable suspicion for continued detention following a traffic stop in part because the driver of the rental car was not an authorized driver under the rental agreement. The Court stated (id. at 872):

> "In *Arango* [*U.S. v. Arango*, 912 F.2d 441, 447 (10th Cir. 1990)], an analogous case regarding a traffic stop for speeding, we concluded that the combination of the driver's inability to prove lawful possession of the vehicle and the officer's skepticism regarding the amount of luggage provided reasonable suspicion to justify an inquiry related to the transportation of contraband."

The majority has in effect applied a probable cause–rather than a reasonable suspicions–standard here. But, "[t]he 'reasonable suspicion' standard does not require that officers have probable cause . . . or that the circumstances be such that there is no reasonable hypothesis of innocent behavior." *United States v. Basey*, 816 F.2d 980, 989 (5th Cir. 1987). In determining whether there was reasonable suspicion we look at all the circumstances together to "weigh not the individual layers but the 'laminated' total," *United States v. Edwards*, 577 F.2d 883, 895 (5th Cir. 1978), and "[F]actors

12

that ordinarily constitute innocent behavior may provide a composite picture sufficient to raise reasonable suspicion in the minds of experienced officers." *United States v. Holloway*, 962 F.2d 451, 459 (5th Cir. 1992). The majority has ignored these settled precepts.

## II.

Even if the officers did not have reasonable suspicion justifying their continued brief detention of the vehicle until the K-9 alert, such detention in any event was not shown to have violated any of Dortch's rights. Thus the majority errs by holding that continued detention of the vehicle amounted to continued detention of Dortch, because without the vehicle he as a practical matter had to remain in the vicinity.[7] Because neither Dortch nor the other occupant was the renter of the vehicle, and because the rental agreement provided only the renter was an authorized driver, Dortch had no right to complain of the vehicle's detention.

"[T]he proponent of a motion to suppress has t he burden of establishing that his own Fourth Amendment rights were violated by the challenged search or seizure." *Rakas v. Illinois*, 99 S. Ct. 421, 424 n.1 (1978).

The suppression hearing record contains no evidence that either Dortch or his passenger had any right to drive the car or to be in possession of it; nor does the suppression hearing record contain any

---

[7]Testimony at the suppression hearing reflected that the officers told Dortch, while they were waiting for the report on the inquiry concerning his license, "that he would be free to leave as soon as the warrant checks came back but we were going to detain the car until the K-9 could get there." Dortch replied "I'll just stay with the car." Officer Ener testified that Dortch never asked for his driver's license back and had he either asked for it, or indicated he wanted to leave, the license would have been returned to him, and "we would have called another patrol unit to come pick him up and take him down to the truck stop which was just a few miles away. We have done this in the past," and that when the warrant check came back "at that point if he had indicated he wanted to leave, we would have handed him everything and if he had wanted us to call somebody, we would have."

The majority's footnote 4 is puzzling because it fails to address the fact that Dortch's claim of personal detention wholly depends on his claim of detention of the vehicle, a vehicle which neither he nor the sole other occupant had any right to drive or possess.

13

evidence that Bender, who was the named renter in the rental agreement, gave Dortch or the passenger permission to use or drive the vehicle.[8] See *United States v. Parks*, 684 F.2d 1078, 1084-85 (5th Cir. 1982) (district court not required to find that defendant met his burden of showing his possession of airplane was legitimate so as to give rise to a protectable Fourth Amendment interest; his possession of the key and the absence of evidence the plane was stolen did not suffice). The suppression hearing record does contain evidence that under the rental agreement neither Dortch nor the passenger was an authorized driver. These facts distinguish the instant case from *United States v. Kye Soo Lee*, 989 F.2d 1034 (5th Cir. 1990), where we rejected the government's appeal from the granting of a motion to suppress on a showing that the renter of the searched truck had entrusted it to the driver, but the opinion makes no reference to any restriction in the rental agreement on who could drive the truck.

In *United States v. Riazco*, 91 F.3d 752, 755 (5th Cir. 1996), we noted that the Fourth and Tenth Circuits "have held that persons driving a rental car without the authorization of the rental company have no standing to challenge the validity of a search, because they have no legitimate expectation of privacy in such circumstances," citing *United States v. Wellons*, 32 F.3d 117, 119 & n.4 (4th Cir. 1994) and *United States v. Roper*, 918 F.2d 885, 887-88 (10th Cir. 1990). Accordingly, in *Riazco* we reversed the district court's grant of the motion to suppress where neither the driver nor the passenger was the renter and the rental agreement stated that the car was to be driven only by persons

---

[8]At the conclusion of the subsequent trial on the merits, Dortch, on cross-examination by the government, testified that he accompanied Bender when the car was rented and he paid for its rental and was given to understand by the rental company that he did not have to be listed as an additional driver in order to be allowed to drive it. Because Dortch did not renew his motion to suppress at trial, he may not avail himself of this trial evidence in his instant challenge to the district court's denial of his motion. See *United States v. Marbury*, 732 F.2d 390, 400 n.13(5th Cir. 1984).

14

authorized by the rental company and neither the driver nor the passenger was so authorized. We distinguished *Key Soo Lee* on the basis that in *Riazco* there was no evidence that the renter had authorized the <u>driver</u> to drive, only that the passenger had done so. In *United States v. Boruff*, 909 F.2d 111 (5th Cir. 1990), "Boruff arranged to have his girlfriend, Brenda Lawless (Lawless), rent a car which he planned to use in the smuggling operation. Lawless rented a white Lincoln Towncar in her own name and turned it over to Boruff. The standard rental agreement signed by Lawless provided that only she would drive the car . . . ." Id. at 113-14. Later, while Boruff was driving the car, and alone in it, it was stopped and searched. We held Boruff could not complain of the search:

> "Boruff had no legitimate expectation of privacy in the rental car. Under the express terms of the rental agreement, Lawless was the only legal operator of the vehicle. Lawless had no authority to give control of the car to Boruff." Id. at 117.

In a recent opinion which carefully considers the relevant state and federal authorities, a Texas appellate court has elected to follow the *Boruff* approach rather than apply the result of *Keye Soo Lee*. See *Rovnak v. State*, 990 S.W.2d 863, 867-71 (Tex. App.-Texarkana, 1999; pet. ref'd).[9]

While *Keye Soo Lee* predated *Boruff*, and if the two are in conflict we are bound by *Keye Soo Lee*, nevertheless *Keye Soo Lee* is distinguishable because it does not reflect, and did not address, the terms of the rental agreement (and because the suppression hearing evidence there, credited by the district court, showed the renter had entrusted the vehicle to the driver). But, if *Keye Soo Lee* and *Boruff* are in conflict, serious consideration should be given to taking this case en banc, to clarify our law in this respect and follow *Boruff* and the rule in the Fourth and Tenth Circuits.

---

[9]Incidentally, *Riazco*, *Boruff* and *Rovnak* all illustrate the use of vehicles rented by absent third parties in narcotics trafficking, just as Officer Ener testified.

15

For these reasons, I dissent from the majority's holding that the district court erred in denying the motion to suppress.