Gerald Tyrone Turner v. State















IN THE
TENTH COURT OF APPEALS
 

No. 10-02-051-CR
No. 10-02-052-CR

     GERALD TYRONE TURNER,
                                                                         Appellant
     v.

     THE STATE OF TEXAS,
                                                                         Appellee
 

From the 382nd District Court
Rockwall County, Texas
Trial Court Nos. 2-00-339 and 2-00-340
                                                                                                                
                                                                                                         
DISSENTING OPINION
                                                                                                                

      This is the second motion to withdraw that has been filed by counsel. The first was denied
by the Fifth Court of Appeals before this case was transferred to this court. The motion was
denied because it was defective. This motion is also defective. Counsel does not assert that
Turner has been notified of his right to object to the motion. Tex. R. App. P. 6.5.
      Further, the motion offers no reason that the motion should be granted. While it does assert
that Turner is indigent, it does not assert that Counsel has not already been paid for the services
or that there is some compelling reason that counsel should be released from his agreement to
represent Turner.
      The motion also erroneously asserts that granting the motion will not work a delay. It already
has caused a delay and ordering this cause abated will cause further delay. According to the
motion, the trial court is waiting on our decision on the motion to withdraw before the trial court
acts on the motion to appoint counsel. We are now waiting on the trial court before we decide the
motion.
      I would deny the motion and order retained counsel to prepare and file appellant’s brief, thus
compelling counsel to deal with the situation he has created. Because the majority does not, I
respectfully dissent.
      The issue of a free record is not currently before us. I would not address it and do not join
the majority’s discussion related thereto.

                                                                         TOM GRAY
                                                                         Justice

Dissenting opinion delivered and filed April 24, 2002
Publish



160;                                                                                                     

      This is an appeal from a conviction for the offense of Possession of a Controlled
Substance, Penalty Group 1, in an amount over one gram. A jury determined that Dale Arthur
Wolf (Wolf) had possessed 3,4-Methylenedioxy Methamphetamine, also known as MDA or
ecstasy, and assessed punishment, which the court imposed, of ten years’ confinement at the
Texas Department of Criminal Justice—Institutional Division. Wolf brings two issues on
appeal: (1) whether the court erred in denying his motion to suppress evidence, and (2)
whether the court erred in overruling his objection to the admission of evidence that marihuana
was also found in his truck. Because we find that the court should have granted Wolf’s motion
to suppress, we reverse the conviction and remand the cause to the trial court for further
proceedings.
BACKGROUND
      At about three o’clock in the morning on July 28, 2000, Officer John Nelson, a state
trooper with the Texas Department of Public Safety, stopped Wolf and his companion, Teressa
Freed, because of a defective “tag lamp” on the Chevy S-10 Blazer that Wolf was driving. 
Freed's four-year-old grandchild was in the backseat, and the back of the vehicle was filled
with luggage and boxes. The patrol-car videotape, taken at the scene of the detention, shows
Nelson asking Wolf and Freed for their drivers’ licenses and looking inside the Blazer. Nelson
asked “What’s in that black thing?” and Wolf and Freed responded, “Tools.” When Nelson
commented that it looked as if they had been on vacation, Freed explained that they were
“bringing [her] grandbaby home.” Nelson told them it would be just a warning, not a ticket,
and returned to his patrol car, where he radioed a request for criminal history and outstanding
warrant reports on both Wolf and Freed.
      About four minutes later, he called Officer John Semetko, a K-9 patrol officer with the
City of Corsicana Police Department, and asked him to listen to the criminal history as it came
back on Wolf and Freed, noting that he was “not sure what we’re going to have,” but that
“there was nervousness there.” Nelson testified during the suppression hearing and at trial that
Freed was nervous and Wolf was overly cooperative.
      Semetko said that he was en route to the scene with a narcotics-sniffing dog. He and the
dog arrived about ten to fifteen minutes after the car was stopped, only about three minutes
after the dispatcher indicated that no criminal history was available on either Wolf or Freed. 
The videotape shows Wolf walking toward the patrol car to talk to Nelson at the same time the
dog sniff began.


 At the suppression hearing, both officers testified that Wolf consented to
their search of the vehicle, however Wolf contends that he could not have consented to the
search because he did not own the Blazer. Although neither officer testified to the dog’s
positive alert, the videotape shows Nelson telling Wolf that the dog had alerted to the presence
of drugs and asking Wolf if he would mind if the officers searched the vehicle. Wolf
responded, “I don’t.” The officers found marihuana in the front center console, in Freed's
purse, and packed in an envelope in a black overnight bag in the back of the truck. The bag
also contained about seven pills, later determined to be ecstasy.
      At the suppression hearing, Officer Nelson testified, “I don’t know if I’ve ever issued a
citation [for a defective tag lamp].” He said, on cross-examination, that he prolonged the
detention, after receiving a clear warrant-report, because of Freed’s nervousness and Wolf’s
overly cooperative behavior.
DEFENSE ATTORNEY:       There were other reasons that you would, had, had decided to
base your further detention on Mr. Wolf on other than the
defective tag lamp.
 
OFFICER NELSON:             Correct. Nervousness.
 
DEFENSE ATTORNEY:       Right. The tag lamp issue had fairly well been resolved after
you made the contact. It was the nervousness and the weirdness
of his response that gave you suspicion to go ahead and continue
the, continue what turns into an investigation; is that fair to say?
 
OFFICER NELSON:             Fair to say.

      The court denied Wolf’s motion to suppress, and the ecstasy was admitted into evidence.
THE SEARCH
Standard of Review
      Wolf first argues that the court erred in denying his motion to suppress evidence. In
reviewing a ruling on a motion to suppress, we give “almost total deference to a trial court’s
determination of historical facts” and review de novo the court’s application of the law of
search and seizure. Walter v. State, 28 S.W.3d 538, 540 (Tex. Crim. App. 2000) (quoting
Guzman v. State, 955 S.W.2d 85, 88-89 (Tex. Crim. App. 1997)). Because the Fourth
Amendment is applicable to the states through the Fourteenth Amendment, we look to both
state and federal case law in our analysis. See Wolf v. Colorado, 338 U.S. 25, 69 S.Ct. 1359,
93 L.Ed. 1782 (1949), and Mapp v. Ohio, 367 U.S. 643, 81 S.Ct. 1684, 6 L.Ed.2d 1081
(1961). The facts here are not disputed, so we review only for application of law to fact.
The Initial Traffic Stop
      In general, the decision to stop an automobile is reasonable when the police have probable
cause to believe that a traffic violation has occurred. Walter, 28 S.W.3d at 542; see also
Whren v. United States, 517 U.S. 806, 810, 116 S.Ct. 1769, 1772, 135 L.Ed.2d 89 (1996). 
During such a routine traffic stop, an officer may detain an individual to check for outstanding
warrants. Walter, 28 S.W.3d at 542 (citing Davis v. State, 947 S.W.2d 240, 245 n.6 (Tex.
Crim. App. 1997)). Therefore, both the initial stop related to the tag lamp and Officer
Nelson’s demand for identification and the warrant checks were lawful.
      The patrol-car videotape, however, indicates that Officer Nelson detained Wolf and Freed
for approximately three minutes after learning that neither was the subject of an outstanding
warrant and that criminal-history reports


 were unavailable due to technical difficulties. In
fact, Officer Nelson radioed Officer Semetko saying, “I’ll just hold up here until you get
here.” This prolonged detention is the subject of our inquiry.
Reasonable Suspicion for the Extended Detention
      In the landmark case of Terry v. Ohio, the United States Supreme Court held that a
temporary investigative detention may be reasonable if: (1) the officer’s action was justified at
its inception; and (2) the detention was reasonably related in scope to the circumstances which
justified the interference in the first place. Terry v. Ohio, 392 U.S. 1, 19-20, 88 S.Ct. 1868,
1879, 20 L.Ed.2d 889 (1968). For the officer’s action to be justified, he “must be able to
point to specific and articulable facts which, taken together with rational inferences from those
facts, reasonably warrant that intrusion.” Id., 392 U.S. at 21, 88 S.Ct. at 1880; Davis, 947
S.W.2d at 242. Moreover, an investigative detention must be temporary and last no longer
than is necessary to effectuate the purpose of the stop. Davis, 924 S.W.2d at 243 (citing
Florida v. Royer, 460 U.S. 491, 500, 103 S.Ct. 1319, 1325, 75 L.Ed.2d 229 (1983)). On
appeal, we review the reasonableness of the detention from the same perspective as the officer:
using an objective standard, we ask whether the facts available at the moment of detention
would warrant a man of reasonable caution in the belief that the action taken was appropriate. 
Terry, 392 U.S. at 21-22, 88 S.Ct. at 1880; Davis, 947 S.W.2d at 243.
      Under this construct, we conclude, as we have previously noted, that Officer Nelson’s
initial detention of Wolf because of the defective tag lamp was justified at its inception. But
Officer Nelson prolonged the detention to allow time for the drug-sniffing dog to arrive. This
detention was neither necessary to allow Nelson time to issue a warning to Wolf, nor was it 
reasonably related in scope to his inquiry about the defective tag lamp. Therefore, this
prolonged detention would violate the Fourth Amendment, unless Officer Nelson had
developed reasonable suspicion of illegal activity that would justify the extended detention
under Terry v. Ohio. Terry, 392 U.S. at 19-20, 88 S.Ct. at 1879.
      Both the Court of Criminal Appeals and the Fifth Circuit Court of Appeals have addressed
similar situations in the past few years. See Davis, 947 S.W.2d at 240; United States v.
Portillo-Aguirre, 311 F.3d 647 (5th Cir. 2002); United States v. Jones, 234 F.3d 234 (5th Cir.
2000); United States v. Dortch, 199 F.3d 193 (5th Cir. 1999).
Davis v. State
      Police officers stopped Davis on suspicion of driving while intoxicated at one o’clock in
the morning in a rural location. Davis, 947 S.W.2d at 241. Davis exited his vehicle and
explained that he was not intoxicated, but merely tired. Id. The officers did not smell alcohol
on Davis, nor did they smell alcohol or drugs coming from his vehicle. Id. Although the
initial purpose of the traffic stop had been completed at this time, the officers questioned both
Davis and his passenger, and the officers believed the answers were inconsistent. Id. A
background check on Davis showed no history of convictions, however, his passenger had one
prior drug-related conviction. Id. Finally, although the vehicle was not registered to Davis, it
had not been reported stolen, and Davis told the officers that he had borrowed it from his
girlfriend. Id. The officers told Davis he was free to leave, but they detained his vehicle and
called a canine unit to the scene. Id. After the dog alerted to the presence of narcotics, Davis
gave the officers his keys and allowed them to search his trunk, where they found marihuana. 
Id.
      The Beaumont Court of Appeals found that the circumstances were sufficient to constitute
reasonable suspicion, but the Court of Criminal Appeals disagreed. Id. at 241-42. The Court
noted that consistent with Terry, Texas courts require reasonable suspicion before a seizure of
the person or property can occur. Id. at 244. “To justify an investigative detention, the
officer must have specific articulable facts, which, premised upon his experience and personal
knowledge, when coupled with the logical inferences from those facts, would warrant the
intrusion on the detainee. These facts must amount to more than a mere hunch or suspicion.” 
Id. The articulable facts used by the officer must create reasonable suspicion of: (1) some
activity out of the ordinary that is occurring or has occurred; (2) some suggestion to connect
the detainee with the unusual activity; and (3) some indication the unusual activity is related to
crime. Id. The Court emphasized that “an investigative detention must be temporary and last
no longer than is necessary to effectuate the purpose of the stop.” Id. at 245.
      In reversing the judgment of conviction, the Court concluded that the purpose of the
investigative detention was effectuated when the officers determined that Davis was not
intoxicated. Id. As to the continued detention, the Court found, “when viewed in an objective
fashion, no known fact, or rational inferences from those facts, would support the conclusion
that appellant was engaged in or soon would engage in criminal activity.” Id.
 

United States v. Portillo-Aguirre
      The Fifth Circuit Court of Appeals followed a similar approach in cases involving border
patrol searches at an immigration checkpoint. United States v. Portillo-Aguirre, 311 F.3d 647,
650 (5th Cir. 2002); see also U.S. v. Ellis, 330 F.3d 677, 678 (5th Cir. 2003).


 In Portillo-Aguirre, Agent Woodruff boarded a bus to perform an immigration inspection, in accordance
with border patrol procedure. Portillo-Aguirre, 311 F.3d at 650. Portillo-Aguirre, a resident
alien, was seated near the front of the bus. Id. Woodruff checked Portillo-Aguirre’s
documents and was satisfied that Portillo-Aguirre’s presence in the United States was lawful. 
Id. After completing his inspection, however, Woodruff walked from the back of the bus to
front, and he noticed a small carry-on bag underneath Portillo-Aguirre’s seat. Id. He later
testified that Portillo-Aguirre appeared rigid, nervous, and looked straight ahead at that
moment. Id. Woodruff stopped and asked him if he had a bag on the bus, and Portillo-Aguirre pointed to a backpack in the overhead bin. When Woodruff asked for permission to
look in the bag, Portillo-Aguirre opened the bag, and “attempted to show that the bag
contained only books and clothes.” Id. at 651. Woodruff requested permission to search the
bag for himself, and Portillo-Aguirre consented. Id. Woodruff discovered a bundle of
narcotics, which was later determined to be cocaine. Id. The extended detention, during
which Woodruff questioned Portillo-Aguirre and searched his bag for drugs, took
approximately three to five minutes. Id. at 656. After the district court denied Portillo-Aguirre’s motion to suppress, a jury convicted him of possession with intent to distribute
cocaine. Id. at 651.
      The circuit court of appeals first concluded that the initial stop was constitutionally
permissible. “Although not supported by reasonable suspicion, the [Supreme] Court [has]
considered the programmatic purpose of the stops—interdicting the flow of illegal aliens—to be
sufficient justification for checkpoint seizures.” Id. at 652; see City of Indianapolis v.
Edmond, 531 U.S. 32, 37, 121 S.Ct. 447, 148 L.Ed.2d 333 (2000). The court noted,
however, “any further detention beyond a brief question or two or a request for documents
evidencing a right to be in the United States must be based on consent or probable cause.” 
Portillo-Aguirre, 311 F.3d at 652.
      The court further noted that questions outside the scope of the stop are permissible, so
long as they do not extend the duration of the stop. Id. at 653. “A stop may not exceed its
permissible duration unless the officer has reasonable suspicion of criminal activity . . . if the
initial, routine questioning generates reasonable suspicion of other criminal activity, the stop
may be lengthened to accommodate its new justification.” Id. Citing with approval its prior
decisions in Jones and Dortch, the court added, “when officers detain travelers after the
legitimate justification for a stop has ended, the continued detention is unreasonable.” Id. at
654; see Jones, 234 F.3d at 234; Dortch, 199 F.3d at 193.
Jones and Dortch
      Similarly, in both Jones and Dortch, which dealt with traffic stops, the circuit court of
appeals found prolonged detentions of motorists to violate the Fourth Amendment. Dortch was
stopped for traveling too close to a tractor-trailer. Dortch, 199 F.3d at 195. Jones was a
passenger in a vehicle driven by Daniel, who was stopped for a speeding violation. Jones, 234
F.3d at 237. In both cases the officers prolonged the detention while awaiting the arrival of
narcotics-sniffing dogs, despite a lack of reasonable suspicion of illegal activity, and after the
dispatcher in each case notified the officers that the motorists had clean criminal histories or no
outstanding warrants. Jones, 234 F.3d at 238, 241; Dortch, 199 F.3d at 196, 199. Jones was
detained an additional three minutes, and Dortch was detained about five minutes before the
dog and its handler mustered to the scene. Jones, 234 F.3d at 238; Dortch, 199 F.3d at 196. 
Because of the absence of reasonable suspicion, the court found these prolonged detentions to
violate the Fourth Amendment. Jones, 234 F.3d at 241; Dortch, 199 F.3d at 202-03. The
Dortch court opined: “To hold otherwise would endorse police seizures that are not limited to
the scope of the officer’s reasonable suspicion and that extend beyond a reasonable duration.” 
Dortch, 199 F.3d at 199-200.
Application
      Officer Nelson stopped Wolf to give him a warning about his defective tag lamp. He
detained Wolf approximately three minutes after learning that no criminal history information
was available for Wolf or his passenger, Freed. The only articulable reasons that Officer
Nelson gave for detaining Wolf were that Freed was nervous and Wolf was overly
cooperative.


 “It is not indicative of guilt for a person to be nervous when confronted by
police officers asking questions.”


 Davis, 947 S.W.2d at 248 (Mansfield, J., concurring). 
Nor can we conclude that cooperating with police officers who are asking questions supports
an inference of illegal activity. We find in the record no articulated basis for a reasonable
suspicion that some activity out of the ordinary related to crime was occurring or had occurred. 
Id. at 244. Rather, we conclude that the facts available to Nelson after receiving the criminal
history information would not warrant a man of reasonable caution in the belief that prolonging
the detention was appropriate.


 Terry, 392 U.S. at 21-22, 88 S.Ct. at 1880; Davis, 947
S.W.2d at 243. 
      Because the initial detention was longer than was reasonably necessary to effectuate the
purpose of the stop, that is, to warn Wolf about the defective tag lamp, and because the
prolonged detention was not supported by reasonable suspicion, we find that the prolonged
detention violated Wolf’s Fourth Amendment rights. See Davis, 924 S.W.2d at 243.
Consent to Search
      Under the “fruit of the poisonous tree” doctrine, all evidence derived from the exploitation
of an illegal seizure must be suppressed, unless the State shows that there was a break in the
chain of events sufficient to refute the inference that the evidence was a product of the Fourth
Amendment violation. See Portillo-Aguirre, 311 F.3d at 658. “‘Consent to search may, but
does not necessarily, dissipate the taint of a fourth amendment violation.’” Id., (quoting
United States v. Chavez-Villareal, 3 F.3d 124, 127 (5th Cir. 1993)). Therefore, we must now
consider whether Wolf’s consent to a search of the truck attenuated the taint of the unlawful
detention, such that the court’s denial of his motion to suppress was not erroneous.
      In evaluating Wolf’s consent, we use a two-pronged test: (1) whether the consent was
voluntarily given; and (2) whether the consent was an independent act of free will. Portillo-Aguirre, 311 F.3d at 658 (quoting Chavez-Villareal, 3 F.3d at 127). Six factors bear on the
first prong, voluntariness of the consent: (1) the voluntariness of the defendant’s custodial
status; (2) the presence of coercive police procedures; (3) the extent and level of the
defendant’s cooperation with the police; (4) the defendant’s awareness of his right to refuse
consent; (5) the defendant’s education and intelligence; and (6) the defendant’s belief that no
incriminating evidence will be found. Portillo-Aguirre, 311 F.3d at 658. Although all six
factors are relevant, no single factor is dispositive. Id. As to the second prong, whether the
consent was an independent act of free will, we consider: (1) the temporal proximity of the
illegal conduct and the consent; (2) the presence of intervening circumstances; and (3) the
purpose and flagrancy of the initial misconduct. Id. at 659.
      With these principles in mind, we turn to the facts at hand. We focus our attention on the
second prong of the test: whether the consent was an independent act of free will, where the
record clearly guides our decision. First, the patrol-car videotape and the officers’ testimony
at the suppression hearing indicates that there was a close temporal proximity between the
illegal conduct—the extended detention—and the consent. As in Portillo-Aguirre, the consent
to search came about five minutes after the illegal, extended detention began. See id. No
circumstances intervened between the detention and the consent, and there is nothing to suggest
that Wolf believed he was free to go during that time. See id. In fact, Officer Nelson testified
at the suppression hearing that although Wolf had been told he was not under arrest, he would
not have been free to go during the time when the narcotics dog was en route to the scene. 
Moreover, Nelson also said that he detained Wolf and Freed for two reasons: (1) to obtain a
criminal history return; and (2) to allow the narcotics dog time to arrive. The former reason 
was justified and the latter was not. The results of the criminal history are audible in the
patrol-car videotape, after which Nelson told Semetko “I’ll hold up here until you get here.” 
Although not flagrant, the purpose of the misconduct was to illegally detain Wolf until an
unsubstantiated hunch could be acted upon. Thus, using these three factors, we conclude that
Wolf’s consent was not an independent act of free will. See id. at 659. Therefore, the court
should have granted Wolf’s motion to suppress.
Harm Analysis
      Finally, under Texas law, having concluded that the court should have granted Wolf’s
motion to suppress, we are bound to conduct a harm analysis. Tex. R. App. P. 44.2(a) (“If the
appellate record in a criminal case reveals constitutional error that is subject to harmless error
review, the court of appeals must reverse a judgment of conviction or punishment unless the
court determines beyond a reasonable doubt that the error did not contribute to the conviction
or punishment.”); Atkins v. State, 951 S.W.2d 787, 797 (Tex. Crim. App. 1997) (citing Cain
v. State, 947 S.W.2d 262, 264 (Tex. Crim. App. 1997) (“[A]ll errors, except certain federal
constitutional errors deemed ‘structural,’ are subject to a harm analysis.”). Without the
evidence discovered as a result of the illegal detention and search, the State would have had no
basis on which to convict Wolf of possession of ecstasy. See Dortch, 199 F.3d at 203; see
also Hall v. State, 74 S.W.3d 521, 527 (Tex. App.—Amarillo 2002, no pet.). Therefore, we
cannot conclude beyond a reasonable doubt that the error did not contribute to the conviction. 
Tex. R. App. P. 44.2(a). Accordingly, we must reverse the judgment. Id. We sustain Wolf’s
first issue.
CONCLUSION
      Having sustained Wolf’s first issue, we do not reach his second issue. The judgment is
reversed, and the cause is remanded to the trial court for further proceedings.



                                                                   BILL VANCE
                                                                   Justice

Before Chief Justice Gray,
      Justice Vance, and 
      Justice Reyna



      (Chief Justice Gray dissenting)
Reversed and remanded
Opinion delivered and filed May 12, 2004
Publish 

[CR25]