Dale A. WOLF, Appellant

v.

The STATE of Texas, Appellee.

No. 10–02–147–CR.

Court of Appeals of Texas, Waco.

May 12, 2004.

Kelly R. Myers, Attorney At Law, Corsicana, for Appellant/Relator.

Steve A. Keathley, Navarro County District Attorney, David P. Lamb, Navarro County Asst. District Attorney, Corsicana, for Appellee/Respondent.

Before Chief Justice GRAY, Justice VANCE, and Justice REYNA.*

## OPINION

VANCE, Justice.

This is an appeal from a conviction for the offense of Possession of a Controlled Substance, Penalty Group 1, in an amount over one gram. A jury determined that Dale Arthur Wolf (Wolf) had possessed

---

\* This case was submitted with former Chief Justice Davis on the panel, but he resigned effective August 4, 2003. Justice Reyna, who took office on January 5, 2004, participated in the decision.

3,4–Methylenedioxy Methamphetamine, also known as MDA or ecstasy, and assessed punishment, which the court imposed, of ten years' confinement at the Texas Department of Criminal Justice—Institutional Division. Wolf brings two issues on appeal: (1) whether the court erred in denying his motion to suppress evidence, and (2) whether the court erred in overruling his objection to the admission of evidence that marihuana was also found in his truck. Because we find that the court should have granted Wolf's motion to suppress, we reverse the conviction and remand the cause to the trial court for further proceedings.

## BACKGROUND

At about three o'clock in the morning on July 28, 2000, Officer John Nelson, a state trooper with the Texas Department of Public Safety, stopped Wolf and his companion, Teressa Freed, because of a defective "tag lamp" on the Chevy S–10 Blazer that Wolf was driving. Freed's four-year-old grandchild was in the backseat, and the back of the vehicle was filled with luggage and boxes. The patrol-car videotape, taken at the scene of the detention, shows Nelson asking Wolf and Freed for their drivers' licenses and looking inside the Blazer. Nelson asked "What's in that black thing?" and Wolf and Freed responded, "Tools." When Nelson commented that it looked as if they had been on vacation, Freed explained that they were "bringing [her] grandbaby home." Nelson told them it would be just a warning, not a ticket, and returned to his patrol car, where he radioed a request for criminal history and outstanding warrant reports on both Wolf and Freed.

About four minutes later, he called Officer John Semetko, a K–9 patrol officer

with the City of Corsicana Police Department, and asked him to listen to the criminal history as it came back on Wolf and Freed, noting that he was "not sure what we're going to have," but that "there was nervousness there." Nelson testified during the suppression hearing and at trial that Freed was nervous and Wolf was overly cooperative.

Semetko said that he was en route to the scene with a narcotics-sniffing dog. He and the dog arrived about ten to fifteen minutes after the car was stopped, only about three minutes after the dispatcher indicated that no criminal history was available on either Wolf or Freed. The videotape shows Wolf walking toward the patrol car to talk to Nelson at the same time the dog sniff began.[1] At the suppression hearing, both officers testified that Wolf consented to their search of the vehicle, however Wolf contends that he could not have consented to the search because he did not own the Blazer. Although neither officer testified to the dog's positive alert, the videotape shows Nelson telling Wolf that the dog had alerted to the presence of drugs and asking Wolf if he would mind if the officers searched the vehicle. Wolf responded, "I don't." The officers found marihuana in the front center console, in Freed's purse, and packed in an envelope in a black overnight bag in the back of the truck. The bag also contained about seven pills, later determined to be ecstasy.

At the suppression hearing, Officer Nelson testified, "I don't know if I've ever issued a citation [for a defective tag lamp]." He said, on cross-examination, that he prolonged the detention, after receiving a clear warrant-report, because of

---

1. The videotape is part of the record, although not played at the suppression hearing. The court knew its contents from an earlier hearing in Freed's case. During this portion of the tape, there is no audio.

Freed's nervousness and Wolf's overly co-operative behavior.

DEFENSE ATTORNEY: There were other reasons that you would, had, had decided to base your further detention on Mr. Wolf on other than the defective tag lamp.

OFFICER NELSON: Correct. Nervousness.

DEFENSE ATTORNEY: Right. The tag lamp issue had fairly well been resolved after you made the contact. It was the nervousness and the weirdness of his response that gave you suspicion to go ahead and continue the, continue what turns into an investigation; is that fair to say?

OFFICER NELSON: Fair to say.

The court denied Wolf's motion to suppress, and the ecstasy was admitted into evidence.

## THE SEARCH

### Standard of Review

■ Wolf first argues that the court erred in denying his motion to suppress evidence. In reviewing a ruling on a motion to suppress, we give "almost total deference to a trial court's determination of historical facts" and review *de novo* the court's application of the law of search and seizure. *Walter v. State*, 28 S.W.3d 538, 540 (Tex.Crim.App.2000) (quoting *Guzman v. State*, 955 S.W.2d 85, 88–89 (Tex.Crim. App.1997)). Because the Fourth Amendment is applicable to the states through the Fourteenth Amendment, we look to both state and federal case law in our analysis. *See Wolf v. Colorado*, 338 U.S. 25, 69 S.Ct. 1359, 93 L.Ed. 1782 (1949), and *Mapp v. Ohio*, 367 U.S. 643, 81 S.Ct. 1684, 6 L.Ed.2d 1081 (1961). The facts here are not disputed, so we review only for application of law to fact.

### The Initial Traffic Stop

■ In general, the decision to stop an automobile is reasonable when the police have probable cause to believe that a traffic violation has occurred. *Walter*, 28 S.W.3d at 542; *see also Whren v. United States*, 517 U.S. 806, 810, 116 S.Ct. 1769, 1772, 135 L.Ed.2d 89 (1996). During such a routine traffic stop, an officer may detain an individual to check for outstanding warrants. *Walter*, 28 S.W.3d at 542 (citing *Davis v. State*, 947 S.W.2d 240, 245 n. 6 (Tex.Crim.App.1997)). Therefore, both the initial stop related to the tag lamp and Officer Nelson's demand for identification and the warrant checks were lawful.

The patrol-car videotape, however, indicates that Officer Nelson detained Wolf and Freed for approximately three minutes after learning that neither was the subject of an outstanding warrant and that criminal-history reports [2] were unavailable due to technical difficulties. In fact, Officer Nelson radioed Officer Semetko saying, "I'll just hold up here until you get here." This prolonged detention is the subject of our inquiry.

### Reasonable Suspicion for the Extended Detention

■ In the landmark case of *Terry v. Ohio*, the United States Supreme Court held that a temporary investigative detention may be reasonable if: (1) the officer's action was justified at its inception; and (2) the detention was reasonably related in scope to the circumstances which justified the interference in the first place. *Terry v. Ohio*, 392 U.S. 1, 19–20, 88 S.Ct. 1868, 1879, 20 L.Ed.2d 889 (1968). For the offi-

**2.** Although Officer Nelson testified at the suppression hearing that both Wolf and Freed had prior criminal histories, he conceded on cross-examination that he was not aware of that at the time.

cer's action to be justified, he "must be able to point to specific and articulable facts which, taken together with rational inferences from those facts, reasonably warrant that intrusion." *Id.*, 392 U.S. at 21, 88 S.Ct. at 1880; *Davis*, 947 S.W.2d at 242. Moreover, an investigative detention must be temporary and last no longer than is necessary to effectuate the purpose of the stop. *Davis*, 947 S.W.2d at 243 (citing *Florida v. Royer*, 460 U.S. 491, 500, 103 S.Ct. 1319, 1325, 75 L.Ed.2d 229 (1983)). On appeal, we review the reasonableness of the detention from the same perspective as the officer: using an objective standard, we ask whether the facts available at the moment of detention would warrant a man of reasonable caution in the belief that the action taken was appropriate. *Terry*, 392 U.S. at 21–22, 88 S.Ct. at 1880; *Davis*, 947 S.W.2d at 243.

Under this construct, we conclude, as we have previously noted, that Officer Nelson's initial detention of Wolf because of the defective tag lamp was justified at its inception. But Officer Nelson prolonged the detention to allow time for the drug-sniffing dog to arrive. This detention was neither necessary to allow Nelson time to issue a warning to Wolf, nor was it reasonably related in scope to his inquiry about the defective tag lamp. Therefore, this prolonged detention would violate the Fourth Amendment, *unless Officer Nelson had developed reasonable suspicion of illegal activity that would justify the extended detention under Terry v. Ohio. Terry*, 392 U.S. at 19–20, 88 S.Ct. at 1879.

Both the Court of Criminal Appeals and the Fifth Circuit Court of Appeals have addressed similar situations in the past few years. *See Davis*, 947 S.W.2d at 240; *United States v. Portillo–Aguirre*, 311 F.3d 647 (5th Cir.2002); *United States v. Jones*, 234 F.3d 234 (5th Cir.2000); *United States v. Dortch*, 199 F.3d 193 (5th Cir. 1999).

### Davis v. State

Police officers stopped Davis on suspicion of driving while intoxicated at one o'clock in the morning in a rural location. *Davis*, 947 S.W.2d at 241. Davis exited his vehicle and explained that he was not intoxicated, but merely tired. *Id.* The officers did not smell alcohol on Davis, nor did they smell alcohol or drugs coming from his vehicle. *Id.* Although the initial purpose of the traffic stop had been completed at this time, the officers questioned both Davis and his passenger, and the officers believed the answers were inconsistent. *Id.* A background check on Davis showed no history of convictions, however, his passenger had one prior drug-related conviction. *Id.* Finally, although the vehicle was not registered to Davis, it had not been reported stolen, and Davis told the officers that he had borrowed it from his girlfriend. *Id.* The officers told Davis he was free to leave, but they detained his vehicle and called a canine unit to the scene. *Id.* After the dog alerted to the presence of narcotics, Davis gave the officers his keys and allowed them to search his trunk, where they found marihuana. *Id.*

The Beaumont Court of Appeals found that the circumstances were sufficient to constitute reasonable suspicion, but the Court of Criminal Appeals disagreed. *Id.* at 241–42. The Court noted that consistent with *Terry*, Texas courts require reasonable suspicion before a seizure of the person or property can occur. *Id.* at 244. "To justify an investigative detention, the officer must have specific articulable facts, which, premised upon his experience and personal knowledge, when coupled with the logical inferences from those facts, would warrant the intrusion on the detainee. These facts must amount to more than a mere hunch or suspicion." *Id.* The articulable facts used by the officer must create reasonable suspicion of: (1) some activity out of the ordinary that is occur-

ring or has occurred; (2) some suggestion to connect the detainee with the unusual activity; and (3) some indication the unusual activity is related to crime. *Id.* The Court emphasized that "an investigative detention must be temporary and last no longer than is necessary to effectuate the purpose of the stop." *Id.* at 245.

In reversing the judgment of conviction, the Court concluded that the purpose of the investigative detention was effectuated when the officers determined that Davis was not intoxicated. *Id.* As to the continued detention, the Court found, "when viewed in an objective fashion, no known fact, or rational inferences from those facts, would support the conclusion that appellant was engaged in or soon would engage in criminal activity." *Id.*

### *United States v. Portillo–Aguirre*

The Fifth Circuit Court of Appeals followed a similar approach in cases involving border patrol searches at an immigration checkpoint. *United States v. Portillo–Aguirre*, 311 F.3d 647, 650 (5th Cir.2002); *see also U.S. v. Ellis*, 330 F.3d 677, 678 (5th Cir.2003).[3] In *Portillo–Aguirre*, Agent Woodruff boarded a bus to perform an immigration inspection, in accordance with border patrol procedure. *Portillo–Aguirre*, 311 F.3d at 650. Portillo–Aguirre, a resident alien, was seated near the front of the bus. *Id.* Woodruff checked Portillo–Aguirre's documents and was satisfied that Portillo–Aguirre's presence in the United States was lawful. *Id.* After completing his inspection, however, Woodruff walked from the back of the bus to front, and he noticed a small carry-on bag underneath Portillo–Aguirre's seat. *Id.* He later testified that Portillo–Aguirre appeared rigid, nervous, and looked straight ahead at that moment. *Id.* Woodruff stopped and asked him if he had a bag on the bus, and Portillo–Aguirre pointed to a backpack in the overhead bin. When Woodruff asked for permission to look in the bag, Portillo–Aguirre opened the bag, and "attempted to show that the bag contained only books and clothes." *Id.* at 651. Woodruff requested permission to search the bag for himself, and Portillo–Aguirre consented. *Id.* Woodruff discovered a bundle of narcotics, which was later determined to be cocaine. *Id.* The extended detention, during which Woodruff questioned Portillo–Aguirre and searched his bag for drugs, took approximately three to five minutes. *Id.* at 656. After the district court denied Portillo–Aguirre's motion to suppress, a jury convicted him of possession with intent to distribute cocaine. *Id.* at 651.

The circuit court of appeals first concluded that the initial stop was constitutionally permissible. "Although not supported by reasonable suspicion, the [Supreme] Court [has] considered the programmatic purpose of the stops—interdicting the flow of illegal aliens—to be sufficient justification for checkpoint seizures." *Id.* at 652; *see City of Indianapolis v. Edmond*, 531 U.S. 32, 37, 121 S.Ct. 447, 148 L.Ed.2d 333 (2000). The court noted, however, "any further detention beyond a brief question or two or a request for documents evidencing a right to be in the United States must be based on consent or probable cause." *Portillo–Aguirre*, 311 F.3d at 652.

The court further noted that questions outside the scope of the stop are permissible, so long as they do not extend the duration of the stop. *Id.* at 653. "A stop

---

**3.** *See also U.S. v. Chacon*, 2003 WL 22231298 (W.D.Tex. Sep.19, 2003) (following *Portillo–Aguirre* after remand from Fifth Circuit); *contra U.S. v. Garcia–Garcia*, 319 F.3d 726, 729 (5th Cir.2003) (detention not unreasonable because agent formed reasonable suspicion of drug activity before completing purposes of immigration stop).

may not exceed its permissible duration unless the officer has reasonable suspicion of criminal activity ... if the initial, routine questioning generates reasonable suspicion of other criminal activity, the stop may be lengthened to accommodate its new justification." *Id.* Citing with approval its prior decisions in *Jones* and *Dortch,* the court added, "when officers detain travelers after the legitimate justification for a stop has ended, the continued detention is unreasonable." *Id.* at 654; *see Jones,* 234 F.3d at 234; *Dortch,* 199 F.3d at 193.

### Jones and Dortch

Similarly, in both *Jones* and *Dortch,* which dealt with traffic stops, the circuit court of appeals found prolonged detentions of motorists to violate the Fourth Amendment. Dortch was stopped for traveling too close to a tractor-trailer. *Dortch,* 199 F.3d at 195. Jones was a passenger in a vehicle driven by Daniel, who was stopped for a speeding violation. *Jones,* 234 F.3d at 237. In both cases the officers prolonged the detention while awaiting the arrival of narcotics-sniffing dogs, despite a lack of reasonable suspicion of *illegal activity,* and after the dispatcher in each case notified the officers that the motorists had clean criminal histories or no outstanding warrants. *Jones,* 234 F.3d at 238, 241; *Dortch,* 199 F.3d at 196, 199. Jones was detained an additional three minutes, and Dortch was detained about five minutes before the dog and its handler mustered to the scene. *Jones,* 234 F.3d at 238; *Dortch,* 199 F.3d at 196. Because of

the absence of reasonable suspicion, the court found these prolonged detentions to violate the Fourth Amendment. *Jones,* 234 F.3d at 241; *Dortch,* 199 F.3d at 202–03. The *Dortch* court opined: "To hold otherwise would endorse police seizures that are not limited to the scope of the officer's reasonable suspicion and that extend beyond a reasonable duration." *Dortch,* 199 F.3d at 199–200.

### Application

 Officer Nelson stopped Wolf to give him a warning about his defective tag lamp. He detained Wolf approximately three minutes after learning that no criminal history information was available for Wolf or his passenger, Freed. The only articulable reasons that Officer Nelson gave for detaining Wolf were that Freed was nervous and Wolf was overly cooperative.[4] "It is not indicative of guilt for a person to be nervous when confronted by police officers asking questions."[5] *Davis,* 947 S.W.2d at 248 (Mansfield, J., concurring). Nor can we conclude that cooperating with police officers who are asking questions supports an inference of *illegal activity.* We find in the record no articulated basis for a reasonable suspicion that some activity out of the ordinary related to crime was occurring or had occurred. *Id.* at 244. Rather, we conclude that the facts available to Nelson after receiving the criminal history information would *not* warrant a man of reasonable caution in the belief that prolonging the detention was appropriate.[6] *Terry,* 392 U.S. at 21–22, 88 S.Ct. at 1880; *Davis,* 947 S.W.2d at 243.

---

4. Wolf argued in his brief that these behaviors are as consistent with innocent activity as with criminal activity. The "as consistent with innocent activity as with criminal activity" construct is no longer a viable test for reasonable suspicion. *Woods v. State,* 956 S.W.2d 33, 38 (Tex.Crim.App.1997).

5. The Fifth Circuit also rejected the "generic claim of nervousness" as justifying the extension of the immigration checkpoint stop in *Portillo–Aguirre.* *Portillo–Aguirre,* 311 F.3d at 656.

6. The State suggests in its brief that the prolonged detention was reasonable because of the unavailability of criminal history informa-

Because the initial detention was longer than was reasonably necessary to effectuate the purpose of the stop, that is, to warn Wolf about the defective tag lamp, and because the prolonged detention was not supported by reasonable suspicion, we find that the prolonged detention violated Wolf's Fourth Amendment rights. *See Davis*, 947 S.W.2d at 243.

### Consent to Search

 Under the "fruit of the poisonous tree" doctrine, all evidence derived from the exploitation of an illegal seizure must be suppressed, unless the State shows that there was a break in the chain of events sufficient to refute the inference that the evidence was a product of the Fourth Amendment violation. *See Portillo–Aguirre*, 311 F.3d at 658. " 'Consent to search may, but does not necessarily, dissipate the taint of a fourth amendment violation.' " *Id.*, (quoting *United States v. Chavez–Villarreal*, 3 F.3d 124, 127 (5th Cir. 1993)). Therefore, we must now consider whether Wolf's consent to a search of the truck attenuated the taint of the unlawful detention, such that the court's denial of his motion to suppress was not erroneous.

 In evaluating Wolf's consent, we use a two-pronged test: (1) whether the consent was voluntarily given; and (2) whether the consent was an independent act of free will. *Portillo–Aguirre*, 311 F.3d at 658 (quoting *Chavez–Villarreal*, 3 F.3d at 127). Six factors bear on the first prong, voluntariness of the consent: (1) the voluntariness of the defendant's custodial status; (2) the presence of coercive police procedures; (3) the extent and level of the defendant's cooperation with the police; (4) the defendant's awareness of his right to refuse consent; (5) the defendant's education and intelligence; and (6) the defendant's belief that no incriminating evidence will be found. *Portillo–Aguirre*, 311 F.3d at 658. Although all six factors are relevant, no single factor is dispositive. *Id.* As to the second prong, whether the consent was an independent act of free will, we consider: (1) the temporal proximity of the illegal conduct and the consent; (2) the presence of intervening circumstances; and (3) the purpose and flagrancy of the initial misconduct. *Id.* at 659.

With these principles in mind, we turn to the facts at hand. We focus our attention on the second prong of the test: whether the consent was an independent act of free will, where the record clearly guides our decision. First, the patrol-car videotape and the officers' testimony at the suppression hearing indicates that there was a close temporal proximity between the illegal conduct—the extended detention—and the consent. As in *Portillo–Aguirre*, the consent to search came about five minutes after the illegal, extended detention began. *See id.* No circumstances intervened between the detention and the consent, and there is nothing to suggest that Wolf believed he was free to go during that time. *See id.* In fact, Officer Nelson testified at the suppression hearing that although Wolf had been told he was not under arrest, he would not have been free to go during the time when the nar-

---

tion. The patrol-car videotape reveals that one of two checks came back clear for both Wolf and Freed and that the other could not be completed due to technical difficulties. To say that the absence of information can support reasonable suspicion would be to emasculate the concept of reasonable suspicion and to endorse police seizures based only on the officer's subjective hunch. Rather, we echo the sentiment of Justice Mansfield's concurrence in *Davis*, "No person, however, may be detained, even momentarily, without reasonable and objective grounds." *Davis*, 947 S.W.2d at 246 (Mansfield, J., concurring) (*citing Florida v. Royer*, 460 U.S. 491, 103 S.Ct. 1319, 75 L.Ed.2d 229 (1983); *Dunaway v. New York*, 442 U.S. 200, 99 S.Ct. 2248, 60 L.Ed.2d 824 (1979)).

cotics dog was en route to the scene. Moreover, Nelson also said that he detained Wolf and Freed for two reasons: (1) to obtain a criminal history return; and (2) to allow the narcotics dog time to arrive. The former reason was justified and the latter was not. The results of the criminal history are audible in the patrol-car videotape, after which Nelson told Semetko "I'll hold up here until you get here." Although not flagrant, the purpose of the misconduct was to illegally detain Wolf until an unsubstantiated hunch could be acted upon. Thus, using these three factors, we conclude that Wolf's consent was not an independent act of free will. *See id.* at 659. Therefore, the court should have granted Wolf's motion to suppress.

### Harm Analysis

■ Finally, under Texas law, having concluded that the court should have granted Wolf's motion to suppress, we are bound to conduct a harm analysis. Tex. R.App. P. 44.2(a) ("If the appellate record in a criminal case reveals constitutional error that is subject to harmless error review, the court of appeals must reverse a judgment of conviction or punishment unless the court determines beyond a reasonable doubt that the error did not contribute to the conviction or punishment."); *Atkins v. State,* 951 S.W.2d 787, 797 (Tex. Crim.App.1997) (citing *Cain v. State,* 947 S.W.2d 262, 264 (Tex.Crim.App.1997)) ("[A]ll errors, except certain federal constitutional errors deemed 'structural,' are subject to a harm analysis."). Without the evidence discovered as a result of the illegal detention and search, the State would have had no basis on which to convict Wolf of possession of ecstasy. *See Dortch,* 199 F.3d at 203; *see also Hall v. State,* 74 S.W.3d 521, 527 (Tex.App.-Amarillo 2002, no pet.). Therefore, we cannot conclude beyond a reasonable doubt that the error did not contribute to the conviction. Tex. R.App. P. 44.2(a). Accordingly, we must reverse the judgment. *Id.* We sustain Wolf's first issue.

### CONCLUSION

Having sustained Wolf's first issue, we do not reach his second issue. The judgment is reversed, and the cause is remanded to the trial court for further proceedings.

Chief Justice GRAY dissenting.

GRAY, Chief Justice, dissenting.

In not giving "almost total deference" to the trial court's determinations of fact, the majority has used the wrong standard of review. *See Rayford v. State,* 125 S.W.3d 521, 528 (Tex.Crim.App.2003); *Guzman v. State,* 955 S.W.2d 85, 89 (Tex.Crim.App. 1997). I respectfully dissent.

The trial court's ruling on a motion to suppress evidence is "subject to the discretion of the court." Tex.Code Crim. Proc. Ann. art. 28.01(6) (Vernon 1989); *see Dyar v. State,* 125 S.W.3d 460, 462 (Tex.Crim. App.2003). Only when the case presents the appellate court with "a question of law based on undisputed facts" does the court review the ruling de novo. *Id.* However, a reviewing court must "give almost total deference to a trial court's determination of historical facts." *Rayford* at 528; *accord Guzman* at 89. Moreover, an appellate court is "obligated to uphold the trial court's ruling on [an] appellant's motion to suppress if that ruling was supported by the record." *Armendariz v. State,* 123 S.W.3d 401, 404 (Tex.Crim.App.2003), *cert. denied,* 158 L.Ed.2d 469 (2004). Where the trial court does not make express findings of fact, appellate courts "review the evidence in a light most favorable to the trial court's ruling and assume that the trial court made implicit findings of fact supported in the record." *Balentine v. State,* 71 S.W.3d 763, 768 (Tex.Crim.App. 2002).

The majority states that the facts are not disputed, and thus uses a de novo standard of review. (137 S.W.3d at 801.). But the facts are disputed. Appellant introduced a video recording of the stop. As the record shows, the trial court did not view the recording in the hearing on the motion to suppress, although he had done so in a proceeding concerning Appellant's co-defendant. For that reason, we should be leery of putting much weight on the video. But the majority apparently credits the video to the exclusion of the live testimony before the court. We must, instead, defer to the trial court's determination of the facts, and to the trial court's determination of mixed questions of law and fact, even when those determinations are based on evidence concerning which the trial court has little or no advantage over the appellate court, such as affidavits. *Manzi v. State*, 88 S.W.3d 240, 242–44 (Tex.Crim. App.2002). This rule has even stronger effect in the review of video recordings, whose images and sounds are often difficult to understand and interpret. Appellant testified that the video recording was partial and imperfect, in that "there's parts of it that the audio has been dropped out." To the extent that the recording differs from the testimony of the witnesses, the historical facts are disputed. Moreover, there were conflicts between the arresting officer's testimony on direct and on cross-examination. For example, on direct examination, he testified that he had "[p]rior [criminal] histories on both subjects" while he was writing warnings for Appellant and his passenger; but on cross-examination, the officer testified to the contrary. Accordingly, we must give almost total deference to the trial court's determination of those facts and of mixed questions of law and fact, so long as those determinations are supported by the record. Here, the trial court's determinations are supported by the record. That record does not show that the officer extended his detention of Appellant any longer than was necessary to complete writing Appellant a warning.

We should consider the matter of Appellant's apparent voluntary consent to search, and if necessary, consider Appellant's other issue. Because the Court does otherwise, I respectfully dissent.