# TEXAS COURT OF APPEALS, THIRD DISTRICT, AT AUSTIN

### NO. 03-07-00039-CR

**Jesus Ordaz, Appellant**

**v.**

**The State of Texas, Appellee**

**FROM THE DISTRICT COURT OF WILLIAMSON COUNTY, 26TH JUDICIAL DISTRICT
NO. 06-220-K26, HONORABLE BILLY RAY STUBBLEFIELD, JUDGE PRESIDING**

## M E M O R A N D U M  O P I N I O N

Jesus Ordaz appeals from his conviction by a jury of the second degree felony offense of money laundering. *See* Tex. Penal Code Ann. § 34.02 (West Supp. 2006). After appellant pleaded true to an enhancement penalty, the jury assessed punishment at 40 years in prison and a $10,000 fine, and the trial court sentenced him accordingly. In four issues, appellant contends that the trial court erred in its jury charge and in denying his motion to suppress, and that the evidence was legally and factually insufficient to support his conviction. Because the trial court did not err in its charge or in denying the motion to suppress, and the evidence was sufficient to support appellant's conviction, we affirm the judgment.

## BACKGROUND

The evidence at trial showed that on the afternoon of January 26, 2006, Officer Eric Mount, an officer assigned to the traffic division of the Round Rock Police Department with

extensive training and experience in the field of narcotics interdiction, observed appellant traveling southbound in a Dodge Durango on Interstate 35. Because appellant was traveling at 70 miles per hour, which was in excess of the posted limit of 65 miles per hour, Mount pulled alongside the vehicle and motioned to appellant, the driver, to slow down. When Mount could not get appellant's attention and appellant continued to focus straight ahead, Mount activated his overhead lights and attempted to execute a stop. Although there was room for appellant to pull over on the side of the highway, he continued down the highway for approximately a quarter of a mile. Appellant then pulled into a restaurant parking lot and stopped. Appellant's delay in stopping gave Mount concern that appellant was either trying to conceal something or was attempting to retrieve a weapon before stopping.

As Mount approached the vehicle, he observed appellant in the driver's seat and a female in the passenger seat. A license check showed that the vehicle was registered to a female with a home address in San Antonio. Appellant identified himself and showed a driver's license listing his home address in Eagle Pass. Patricia Morales, the passenger, identified herself as the owner of the car, but she did not have insurance. As Mount explained to appellant that Mount stopped him because he was speeding, Mount noticed the smell of air freshener or deodorizer coming from the vehicle. He observed boxes of ziplock plastic bags, a container of air freshener, and baby wet wipes in the back seat. Mount also observed a "big computer looking thing" on the dashboard that he identified as a GPS, a global positioning system.

Mount testified at some length that the items he observed were consistent with narcotics trafficking and an attempt to conceal contraband. Because he makes from 8 to 20 vehicle

2

stops a day on Interstate 35 and, based on his training, Mount testified that Interstate 35 is a major drug artery and Eagle Pass, a common destination for narcotics trafficking. He testified that tracking devices such as the one on the dashboard are commonly used by narcotics traffickers to track the transport vehicle. Based on his cumulative observations and his growing suspicions, Mount separated appellant and Morales and questioned them about their trip.

Appellant told Mount that he and Morales, who he identified as his wife, had been to Dallas to visit Morales's cousin. Mount testified that, while speaking with appellant, appellant displayed nervous behavior. Appellant began to shake, his eye twitched, his lower lip quivered, and his mouth appeared dry and he was licking his lips. Although appellant had appeared to understand English early in their conversation, he later indicated he did not understand Mount.[1] Morales told Mount that she and appellant had driven to Dallas from Eagle Pass to visit friends and "buy some wigs."

Mount testified that, because of his suspicions of criminal activity, he asked Morales for consent to search the vehicle. She agreed. Another officer, Martin Flores, who spoke Spanish, had arrived at the scene and asked appellant in Spanish for his consent to search the vehicle. Flores testified that appellant gave his verbal consent.

Mount and Flores conducted a search of the vehicle. Mount testified that a screw was missing in the center console in the interior of the vehicle and that three other screws appeared to be "scratched up and obvious that they had been removed for some reason." The officers testified

---

[1] That appellant spoke English as well as Spanish was made clear in his statement given to officers after his arrest.

that they found plastic ziplock bags containing a large quantity of currency beneath the center console. After discovering the currency, the officers arrested appellant and Morales and transported the vehicle to a city maintenance facility where they continued the search. During the course of the search, the officers recovered a total of $116,133 in United States currency, including bundles of currency in plastic bags near the engine where the air filter should have been and in plastic bags located in a hidden compartment underneath the plastic molding on the underside of the vehicle. The currency consisted of various denominations, including large quantities of small denominations. Both officers testified that the currency had a strong smell of "foo foo" or air freshener. A dog specially trained to detect the scent of narcotics alerted to the rear cargo area of the vehicle where the officers observed small amounts of "marijuana debris."

In an interview following his arrest, appellant stated that he and Morales traveled from Eagle Pass to Dallas, that a man whose name he did not know paid him $1500 to transport the currency from Dallas to Eagle Pass, that he concealed the currency inside the vehicle and then drove the vehicle from Dallas until he was stopped in Round Rock, and that, once he arrived in Eagle Pass, he was supposed to be contacted by a man named "Jose" who would provide further instructions on where to take the money. A fingerprint examiner testified at trial that appellant's right thumb print matched a latent fingerprint lifted from one of the boxes containing ziplock bags recovered from the vehicle. Officer Flores testified that no one ever claimed the money seized from the vehicle.

Based upon their observations and their training and experience, the officers testified that the amount of currency recovered from the vehicle and the manner in which it was stored and transported was consistent with the sale and distribution of narcotics. Prior to trial, appellant filed

4

a motion to suppress the physical evidence seized from the vehicle on the grounds that it was seized in violation of the Fourth Amendment of the United States Constitution and Article I, Section 9 of the Texas Constitution because appellant was subjected to an illegal detention. Appellant did not challenge the legality of the initial stop of the vehicle. No hearing was held prior to trial. Appellant presented his motion during trial at the time the State offered a redacted video and audio recording of the traffic stop. The trial court denied the motion.

## ANALYSIS

### *Burden of Proof and Standard of Review*

To suppress evidence on an alleged violation of Fourth Amendment rights, the defendant bears the initial burden of producing evidence that rebuts the presumption of proper police conduct. *Ford v. State*, 158 S.W.3d 488, 492 (Tex. Crim. App. 2005). A defendant satisfies this burden by establishing that a search or seizure occurs without a warrant. *Id*. Once the defendant makes this showing, the burden shifts to the State, which must then establish that the search or seizure was conducted pursuant to a warrant or was reasonable. *Id*.

We review a trial court's ruling on a motion to suppress under a bifurcated standard of review, giving almost total deference to a trial court's determination of historical facts and reviewing *de novo* the court's application of the law. *See Wiede v. State*, 214 S.W.3d 17, 24-25 (Tex. Crim. App. 2007); *Maxwell v. State*, 73 S.W.3d 278, 281 (Tex. Crim. App. 2002); *Guzman v. State*, 955 S.W.2d 85, 87-90 (Tex. Crim. App. 1997). When findings of fact are not requested by the parties and not filed by the trial court as here, we view the evidence in the light most favorable to the trial court's ruling and assume that the trial court made implicit findings of fact that support

5

its ruling as long as those findings are supported by the record. *See State v. Cullen*, 195 S.W.3d 696, 698 (Tex. Crim. App. 2006); *State v. Ross*, 32 S.W.3d 853, 855 (Tex. Crim. App. 2000).

Although appellant concedes that the initial stop of his vehicle was lawful, in his first issue he contends that, instead of issuing a traffic citation for speeding to appellant or for the insurance infraction to Morales, the officers detained him without reasonable suspicion to investigate the possibility that he was transporting drugs. Citing *Kothe v. State*, 152 S.W.3d 54 (Tex. Crim. App. 2004), appellant urges that the officers detained appellant beyond the initial purpose of the stop without the requisite reasonable suspicion that criminal activity was afoot. As in *Kothe*, here, neither the initial stop nor its duration violated the Fourth Amendment, and the consents to search were not thereby tainted. *See id.* at 67.

### Initial Traffic Stops

A law enforcement officer may lawfully stop a motorist who commits a traffic violation. *State v. Gray*, 158 S.W.3d 465, 469 (Tex. Crim. App. 2005); *Garcia v. State*, 827 S.W.2d 937, 944 (Tex. Crim. App. 1992). In general, the decision to stop an automobile is reasonable when an officer has probable cause to believe that a traffic violation has occurred. *Walter v. State*, 28 S.W.3d 538, 542 (Tex. Crim. App. 2000); *see also Whren v. United States*, 517 U.S. 806, 810 (1996). A traffic stop is a "seizure" within the meaning of the Fourth Amendment, even though the purpose of the stop is limited and the resulting detention is brief. *Delaware v. Prouse*, 440 U.S. 648, 653 (1979); *see United State v. Brigham*, 382 F.3d 500, 506 (5th Cir. 2004) (en banc); *Francis v. State*, 922 S.W.2d 176, 178 (Tex. Crim. App. 1996).

6

Officers may stop and briefly detain persons suspected of criminal activity on less information than is constitutionally required for probable cause to arrest. *Terry v. Ohio*, 392 U.S. 1, 21-22 (1968). Because a routine traffic stop is analogous to a temporary investigative detention, we analyze such stop as a *Terry* stop. *See Berkemer v. McCarty*, 468 U.S. 420, 439 (1984); *Brigham*, 382 F.3d at 506. Such detention may last no longer than is necessary to effectuate the purpose of the stop. *Florida v. Royer*, 460 U.S. 491, 500 (1983); *Davis v. State*, 947 S.W.2d 240, 243-45 (Tex. Crim. App. 1997).

During a routine traffic stop, an officer may detain an individual to check for outstanding warrants. *Davis v. State*, 947 S.W.2d 240, 245 n.6 (Tex. Crim. App. 1997); *see also Walter*, 28 S.W.3d at 542. An officer may also request a driver's license, liability insurance information, and vehicle ownership information. *Davis*, 947 S.W.2d at 245; *Veal v. State*, 28 S.W.3d 832, 835 (Tex. App.—Beaumont 2000, pet. ref'd); *Powell v. State*, 5 S.W.3d 369, 377 (Tex. App.—Texarkana 1999, pet. ref'd); *Mohmed v. State*, 977 S.W.2d 624, 628 (Tex. App.—Fort Worth 1998, pet. ref'd). While an officer is awaiting a computer warrant check, questioning about matters unrelated to the initial traffic stop does not violate the Fourth Amendment because such questioning does not extend the duration of an initial valid seizure. *United States v. Sharpe*, 470 U.S. 675, 687 (1985) ("Clearly this case does not involve any delay unnecessary to the legitimate investigation of the law enforcement officers."); *United States v. Shabazz*, 993 F.2d 431, 437 (5th Cir. 1993). In some circumstances, however, extensive questioning about unrelated matters may exceed the scope of the initial stop. *United States v. Kelley*, 981 F.2d 1464, 1470 (5th Cir. 1993).

7

***Reasonable Suspicion***

Under *Terry*, a temporary investigative detention—a Fourth Amendment seizure—is reasonable, and therefore constitutional, if (1) the officer's action was justified at the detention's inception; and (2) the detention was reasonably related in scope to the circumstances that justified the interference in the first place. *Terry*, 392 U.S. at 19-20. For the officer's initial action to be justified under the first *Terry* prong, we ask whether there existed specific, articulable facts that, taken together with rational inferences from those facts, reasonably warranted that intrusion. *Id*. at 21; *see also Davis*, 947 S.W.2d at 242. The officer must have a reasonable suspicion that some activity out of the ordinary is occurring or has occurred, some suggestion to connect the detainee with the unusual activity, and some indication that the unusual activity is related to a criminal act. *Davis*, 947 S.W.2d at 244; *Garza v. State*, 771 S.W.2d 549, 558 (Tex. Crim. App. 1989).

"Reasonable suspicion" exists if the officer has specific, articulable facts that, when combined with rational inferences from those facts, would lead the officer to reasonably conclude that a particular person actually is, has been, or soon will be engaged in criminal activity. *Ford*, 158 S.W.3d at 492; *Garcia v. State*, 43 S.W.3d 527, 530 (Tex. Crim. App. 2001). We give due weight, not to the officer's inchoate and unparticularized suspicion or "hunch," but to the specific reasonable inferences that he is entitled to draw from the facts in light of his experience. *See Terry*, 392 U.S. at 27; *Davis*, 947 S.W.2d at 243 n.3. Whether an officer had reasonable suspicion to support an investigative detention is determined by considering the totality of the circumstances known to the officer at the time the detention occurred. *Ford*, 158 S.W.3d at 492-93. We consider the totality of the circumstances rather than a piecemeal examination of the evidence.

8

*Wiede*, 214 S.W.3d at 25. An investigative detention that is not based on reasonable suspicion is unreasonable and violates the Fourth Amendment. *Davis*, 947 S.W.2d at 243.

A seizure that is reasonable at its inception may violate the Fourth Amendment by virtue of its excessive intensity and scope. *Davis*, 947 S.W.2d at 243. Thus, under the second *Terry* prong, an investigative detention must be temporary and last no longer than is necessary to effectuate the purpose of the stop. *Royer*, 460 U.S. at 500. Once the reason for the stop has been satisfied, the stop may not be used as a "fishing expedition for unrelated criminal activity." *Davis*, 947 S.W.2d at 243. We review the reasonableness of the detention from the same perspective as the officer: using an objective standard, we ask whether the facts available at the moment of detention would warrant a person of reasonable caution in the belief that the action taken was appropriate. *Terry*, 392 U.S. at 21-22; *Davis*, 947 S.W.2d at 243.

The scope of the seizure must be restricted to that necessary to fulfill the seizure's purpose. *Royer*, 460 U.S. at 500. "There is, however, no constitutional stopwatch on traffic stops. Instead, the relevant question in assessing whether a detention extends beyond a reasonable duration is 'whether the police diligently pursued a means of investigation that was likely to confirm or dispel their suspicions quickly.'" *Brigham*, 382 F.3d at 511 (quoting *Sharpe*, 470 U.S. at 686). An investigative detention following a traffic stop "may last as long as is reasonably necessary to effectuate the purpose of the stop, including the resolution of reasonable suspicion, supported by articulable facts within the officer's professional judgment, that emerges during the stop." *Id.* at 512. The Supreme Court has expressly rejected placing a rigid time limitation on *Terry* investigative detentions. *Kothe*, 152 S.W.3d at 64-65.

9

***Continued Investigative Detention***

During the course of a lawful traffic stop, an officer who develops reasonable suspicion that an occupant of the vehicle is engaged in, or will engage in, criminal activity may continue the detention of the occupants of the vehicle to investigate criminal activity beyond the scope of the law violation that formed the basis of the initial stop. *Sims v. State*, 98 S.W.3d 292, 295-96 (Tex. App.—Houston [1st Dist.] 2003, no pet.); *Estrada v. State*, 30 S.W.3d 599, 603 (Tex. App.—Austin 2000, pet. ref'd). In forming reasonable suspicion to justify a continued detention, an officer may draw on his training and experience. *Estrada*, 30 S.W.2d at 603; *see United States v. Cortez*, 449 U.S. 411, 418 (1981).

Once the traffic stop investigation is concluded, the officer may no longer detain the driver, who must be permitted to leave. *Kothe*, 152 S.W.3d at 63-64. An officer may request consent to search a vehicle after the purpose of the traffic stop has been accomplished, as long as the request is reasonable under the circumstances and the officer has not communicated that compliance with the officer's request is required. *Leach v. State*, 35 S.W.3d 232, 235-36 (Tex. App.—Austin 2000, no pet.); *Simpson v. State*, 29 S.W.3d 324, 328 (Tex. App.—Houston [14th Dist.] 2000, pet. ref'd). But if consent is refused, the officer must have reasonable suspicion to continue to detain the person stopped. *Simpson*, 29 S.W.3d at 328. If, during a valid traffic stop and detention, the officer develops reasonable suspicion that the detainee is engaged in criminal activity, continued detention is justified. *Davis*, 947 S.W.2d at 244-45.

10

Appellant does not dispute the validity of the initial traffic stop. Instead, he contends that his detention was unduly prolonged and not supported by reasonable suspicion to justify the continued detention. The record does not support appellant's contention.

Here, Officer Mount pulled alongside a speeding vehicle and tried to attract the attention of the driver, who failed to acknowledge the officer. Mount then activated his overhead lights to stop the vehicle. Mount testified that although there was plenty of room to pull over on the side of the highway, the vehicle took "a little more time than most cars would to stop," "passing several safe places where most cars would have stopped." Instead of pulling over on the side of the highway, the vehicle continued for a quarter of a mile and exited at the next exit, pulling into the parking lot of a restaurant. Mount testified that he ran a computer check on the license plate of the vehicle, learning that it was registered to a female in San Antonio. As he approached the driver, Mount observed that the driver was male and that he presented a driver's license showing his residence as Eagle Pass. Mount testified that he immediately observed "unusual" activities that caused him to be "suspicious at this point:"

> While I'm talking to him I can smell what I would refer to as perfume or air deodorizer something that smells. And also as I'm talking to him in the backseat there is a bag. A ziplock bag and its got a bag of ziplock freezer bag type things, a little bottle of air freshener, and some baby wipes.

On the dashboard, Mount observed a computerized global positioning system unit. Mount questioned the occupants of the vehicle separately, and their accounts of their travels differed from one another. Articulating the circumstances that gave him concern, Mount testified:

11

There was a whole bunch of things from the very beginning. But the fact that when I was driving right next to the driver in a marked police car trying to get his attention. As a cop we're use to people staring at us all the time, this driver wouldn't even look at me. I found it hard to believe he didn't know I was there. I was driving right next to him. He was staring straight ahead holding tight on the steering wheel. When I did try to stop him it took longer than normal to stop. Then before I introduced myself I could smell air freshener. I could see the items; the bags, baby wipes, what not, in the back. There is you know all those things individually may be nothing but when all this stuff happens right there at the beginning it's not a normal traffic stop.

On cross-examination, Mount continued:

[Y]ou have to understand from the minute I walked up to the window when I'd already noticed how long it took to pull over. We already veered over from what a normal vehicle would do. Smelling air freshener, seeing what I saw in the backseat, before I said a word to anybody. So the speeding, the insurance, they still need to be addressed. But I'm more concerned about whether the car was stolen. Are these guys gonna hurt me. What's going on.

As Mount noticed factual discrepancies between the accounts of the vehicle's occupants and observed appellant's nervousness, he asked Morales for consent to search the vehicle. She consented. Speaking Spanish to appellant, Officer Flores asked appellant for consent to search and he, too, agreed. The record does not show that there was any delay from the time the dispatcher informed Mount that neither appellant nor Morales had an outstanding warrant until the occupants consented to the search of the vehicle.

The evidence shows clearly that the information that formed the basis for Mount's suspicion was obtained at the very beginning of the stop and that Mount followed up on the information with legitimate questioning. Throughout the duration of the stop—the driver's license, license check, and review of the vehicle's paperwork—the questioning and conversation between

appellant and Mount continued to provide Mount with additional information that contributed to Mount's reasonable suspicion. The evidence shows that in his conversations with appellant and Morales, as he received conflicting responses about their trip, Mount asked for consent to search the vehicle. *See Kelley*, 981 F.2d at 1470.

Mount's questioning of appellant that took place from the time of the initial stop until the completion of the warning was supported by reasonable suspicion, even when unrelated to the speeding violation. *See United States v. Dortch*, 199 F.3d 193, 198 (5th Cir. 1999); *Shabazz*, 993 F.2d at 437. The additional information—articulable facts and rational inferences from those facts—that Mount discovered or learned during the lawful detention could reasonably form the basis for continued detention and justify further investigation. *See Powell v. State*, 5 S.W.3d 369, 378-79 (Tex. App.—Texarkana 1999, pet. ref'd); *see also Wolf v. State*, 137 S.W.3d 797, 804 (Tex. App.—Waco 2004, no pet.).

These specific, articulable facts and the rational inferences arising from these facts gave the officers a reasonable basis for suspecting that appellant was engaged in illegal activity and for the continued detention. At trial, the officers articulated the factors that gave them a reasonable suspicion to continue to detain appellant. *See, e.g., Leach*, 35 S.W.3d at 235-36 (officer may request consent to search vehicle after purpose of stop has been accomplished, as long as request is reasonable under the circumstances and officer has not conveyed message that compliance with his request is required); *Simpson*, 29 S.W.3d at 328 (same). The officers acted in a diligent and reasonable manner, and there is no evidence that the officers were dilatory in their investigation. The district court did not err by overruling the motion to suppress. We overrule appellant's first issue.

13

In his second and third issues, appellant challenges the legal and factual sufficiency to support his conviction. Specifically, he contends that the State failed to establish beyond a reasonable doubt that the currency found in the vehicle was the proceeds of felony criminal activity or, because of the manner in which the currency was concealed in the vehicle, that appellant knowingly possessed or transported the proceeds.

In a legal sufficiency review, we view the evidence in the light most favorable to the verdict and decide whether any rational trier of fact could have found the essential elements of the convicted offense beyond a reasonable doubt. *Moff v. State*, 131 S.W.3d 485, 488 (Tex. Crim. App. 2004). We consider all evidence the jury was permitted to consider. *Id*. The jury is the exclusive judge of the credibility of the witnesses and of the weight assigned to their testimony. *Jones v. State*, 944 S.W.2d 642, 647 (Tex. Crim. App. 1996).

In a factual sufficiency review, we view all of the evidence admitted before the jury in a neutral light and set aside the jury's verdict only if the evidence of guilt is so weak that the verdict is clearly wrong and manifestly unjust, or the verdict is against the great weight and preponderance of the evidence. *See Watson v. State*, 204 S.W.3d 404, 414-15 (Tex. Crim. App. 2006); *Cain v. State*, 958 S.W.2d 404, 408 (Tex. Crim. App. 1997). A jury's verdict is not clearly wrong and manifestly unjust simply because the jury resolved conflicting views of the evidence in favor of the State. *Cain*, 958 S.W.2d at 410. As the trier of fact and the sole judge of the credibility of the witnesses and the weight to be accorded their testimony, *id*. at 407, the jury may accept or reject all or any evidence presented by the parties and may draw reasonable inferences from the evidence. *Jones v. State*, 184 S.W.3d 915, 919 (Tex. App.—Austin 2006, no pet.).

14

When viewed cumulatively and in the light most favorable to the jury's verdict, the evidence in this case provided a sufficient basis for a rational jury to conclude that the currency recovered from the vehicle driven by appellant was the proceeds of felony criminal activity and that appellant had the requisite knowledge to support his conviction for money laundering.

Displaying signs of nervousness when he spoke with the officer, appellant gave an account of his activities that was inconsistent with that of his passenger and consistent with that of someone engaged in illegal activities. A global positioning system tracking device was located on the dashboard. A narcotics canine alerted to the presence of narcotics in the rear cargo area of the vehicle, and the officers observed small amounts of marijuana shreds there.

The jury also heard and observed extensive evidence about the officers' seizure of $116,133 in United States currency, how the currency was packaged in ziplock bags and concealed throughout the car, that there were large numbers of bills in various, small denominations, and that it had been sprayed with air freshener. In his statement, appellant denied transporting marijuana to Dallas, but he admitted that his "sole purpose" in going to Dallas was "to get the money." Appellant also admitted that he was the one who packed the currency in ziplock bags and concealed it in various places inside the vehicle, that he received $1500 from an unidentified man in Dallas to transport the currency to the Mexican border, and that he was to deliver the currency to a man he identified to officers when he arrived in Eagle Pass. The officers testified that no one ever claimed the money and, based upon their observations, training, and experience, the money recovered from the vehicle was consistent with proceeds from the sale and distribution of narcotics. Appellant did not testify or offer other testimony on his behalf.

15

Even when viewed in a neutral light, the evidence was sufficient to support the jury's conclusion that the currency recovered from the vehicle was the proceeds of felony criminal activity and that appellant knowingly possessed or transported the proceeds of the criminal activity. The evidence was ample and not so weak as to render the jury's verdict clearly wrong or manifestly unjust. Nor was it against the great weight and preponderance of the evidence.

The evidence at trial was both legally and factually sufficient to support the jury's determination that appellant knowingly acquired or maintained an interest in, concealed, possessed, transferred, or transported the proceeds of felony criminal activity. We overrule his second and third issues.

In his fourth issue, appellant contends the court erred by refusing to instruct the jury pursuant to article 38.23. *See* Tex. Code Crim. Proc. Ann. art. 38.23(a) (West 2005). Article 38.23(a) provides that in any case in which the "evidence raises an issue" that evidence was obtained in violation of its provisions, the jury should be instructed to disregard evidence that it believes was obtained in violation of the constitution or laws of Texas or of the United States. *Id*. Appellant contends that the jury should have been instructed to disregard the currency seized in the vehicle if it determined that the evidence had been seized unlawfully.

An article 38.23 instruction is required when a dispute exists concerning an historical fact underlying the manner in which the evidence was obtained. *See Vasquez v. State*, 225 S.W.3d 541, 545 (Tex. Crim. App. 2007); *Wesbrook v. State*, 29 S.W.3d 103, 121 (Tex. Crim. App. 2000); *Bell v. State*, 938 S.W.2d 35, 48 (Tex. Crim. App. 1996); *Thomas v. State*, 723 S.W.2d 696, 707 (Tex. Crim. App. 1986). The disputed fact issue must have a direct bearing on the legality of the

16

police actions in obtaining the evidence. *Garza v. State*, 126 S.W.3d 79, 87 (Tex. Crim. App. 2004). When there is no conflicting testimony regarding the relevant facts, no jury instruction is required.

At trial, appellant failed to raise an issue regarding a factual dispute, but disputed only the inferences to be drawn from the officers' observations and the grounds for appellant's continued detention, which raise only the legal issue of whether appellant's continued detention was based on reasonable suspicion. Although appellant asserts on appeal that a disputed issue exists, his counsel did not respond to the State's assertion that one did not exist and the trial court found that he failed to raise an issue of a disputed historical fact. Appellant was not entitled to an article 38.23(a) jury instruction because he failed to identify a disputed issue of historical fact underlying the legality of his detention. We overrule appellant's fourth issue.

## CONCLUSION

Having overruled appellant's issues, we affirm the judgment of conviction.

_____

Jan P. Patterson, Justice

Before Justices Patterson, Puryear and Pemberton

Affirmed

Filed: October 10, 2007

Do Not Publish

17